# EXHIBIT 2



# Compressed Transcript of the Testimony of
# **ADAM NAGER, 3/21/13**

**Case:** Sanchez v. Sterling Infosystems, Inc., et al.

Summit Court Reporting, Inc.
Phone:215.985.2400
Fax:215.985.2420
Email:depo@summitreporting.com
Internet: www.summitreporting.com

**Sanchez v. Sterling Infosystems, Inc., et al.**                              **ADAM NAGER, 3/21/13**

---

Page 1

```
1    UNITED STATES DISTRICT COURT
     DISTRICT OF RHODE ISLAND
2
     - - - - - - - - - - - - - - - -
3    JOSE G. SANCHEZ, on behalf of himself :
     and all other similarly situated,    :
4                                          :
                      Plaintiff,    :
5                                   :
     vs.                            :Civil Action No.:
6                                   :12-00157
     STERLING INFOSYSTEMS, INC.,    :
7    d/b/a STERLING TESTING SYSTEMS, INC. :
8                      Defendant.   :
     - - - - - - - - - - - - - - - -
9
               March 21, 2013
10             10:02 a.m.
11
12   VIDEOTAPED DEPOSITION of ADAM NAGER, a non-party witness
13   herein, taken pursuant to Notice, and held at the
14   offices of DLA Piper, LLP, 1251 Avenue of the Americas,
15   New York, New York, before Katherine S. Jurac,
16   a Court Reporter and Notary Public of the
17   State of New York.
18
19
20             SUMMIT COURT REPORTING, INC.
21          Certified Court Reporters and Videographers
22             1500 Walnut Street, Suite 1610
23             Philadelphia, Pennsylvania 19102
24   424 Fleming Pike, Hammonton, New Jersey 08037
25   (215) 985-2400 * (609) 567-3315 * (800) 447-8648
                   www.summitreporting.com
```

Page 2

```
1    A P P E A R A N C E S :
2
3         FRANCIS & MAILMAN
          Attorneys for the Plaintiff
4         Land Title Building, 19th Floor
          100 South Broad Street
5         Philadelphia, Pennsylvania 19110
     BY:  JAMES A. FRANCIS, ESQ.
6              -and-
          DAVID A. SEARLES, ESQ.
7
8    DLA PIPER, LLP
          Attorneys for the Defendant
9         1251 Avenue of the Americas, 27th Floor
          New York, New York 10020
10   BY:  MICHAEL O'NEIL, ESQ.
11
12
13   ALSO PRESENT:
14        Peter Ledwith, Videographer
15
16
17
18                  ...
19
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2
                          PAGE:LINE
3    EXAMINATION BY
     MR. FRANCIS:            6:3
4
5    FURTHER EXAMINATION    125:5
     BY MR. FRANCIS:
6
7    EXAMINATION BY         119:17
     MR. O'NEIL:
8
9    Plaintiff's Exhibit 1,    39:3
     STERLING TESTING SYSTEMS DOCUMENT,
10   BATES STAMP NOS. DEF00001 - DEF00007,
     was marked for identification.
11
12   Plaintiff's Exhibit 2,    55:19
     DOCUMENT BATES NOS.
13   DEF00084 - DEF00087, was
14   marked for identification.
15   Plaintiff's Exhibit 3,    69:21
     CONSENT AND DISCLOSURE,
16   BATES STAMP NO. DEF00089,
     was marked for identification.
17
18   Plaintiff's Exhibit 4,    80:23
     CONSENT & DISCLOSURE FORM,
19   BATES STAMP NO. DEF00096,
     was marked for identification.
20
21   Plaintiff's Exhibit 5,    84:13
     CONSENT TO REQUEST CONSUMER REPORT,
22   BATES STAMP NO DEF00100,
23   was marked for identification.
24
25
```

Page 4

```
1          I N D E X - Continued
2                          PAGE:LINE
3    Plaintiff's Exhibit 6,    90:14
     CONSENT TO REQUEST CONSUMER REPORT,
4    BATES STAMP NO. DEF000858,
     was marked for identification.
5
6    Plaintiff's Exhibit 7,    94:7
     CONSENT TO REQUEST CONSUMER REPORT,
7    BATES STAMP NO. DEF00104,
     was marked for identification.
8    Plaintiff's Exhibit 8,    97:21
     CONSENT TO REQUEST CONSUMER REPORT,
9    BATES STAMP DEF00108,
     was marked for identification.
10
11   Plaintiff's Exhibit 9,    101:2
     CONSENT TO REQUEST CONSUMER REPORT,
12   BATES STAMP NOS. DEF000887 - DEF000891,
     was marked for identification.
13   Plaintiff's Exhibit 10,   103:15
     SUPPLEMENTAL RESPONSES,
14   SIX-PAGE DOCUMENT, was
     marked for identification.
15
16
17       (Exhibits retained by counsel.)
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

Sanchez v. Sterling Infosystems, Inc., et al.                                    ADAM NAGER, 3/21/13

Page 5

1       THE VIDEOGRAPHER:  We're going on the
2   record at 10:02 a.m. on March 21st, 2013.  This
3   is Media Unit 1, Volume 1, of a video
4   deposition of Adam Nager, taken by the
5   plaintiff in the matter of -- in re:  Sanchez
6   V. Sterling by the U.S. District Court of Rhode
7   Island.  This deposition is taking place at DLA
8   Piper, LLP, 1251 Sixth Avenue, New York, New
9   York.  The videographer is Peter Ledwith from
10  DALCO Reporting.  The reporter is Kathy Jurac
11  also from DALCO Reporting.
12      Counsel and all present, please introduce
13  themselves in order and who they represent.
14      MR. FRANCIS:  Jim Francis and David
15  Searles for the plaintiff, Jose Sanchez, from
16  the firm of Francis & Mailman.
17      MR. O'NEIL:  Michael O'Neil of DLA Piper
18  on behalf of Sterling Infosystems, Inc.
19      THE VIDEOGRAPHER:  Court Reporter, please
20  swear in the witness.
21
22  ADAM NAGER,
23  having first been duly sworn by the Notary Public
24  (Katherine S. Jurac), and stating his address as
25  548 West 50th Street, Apartment 2-FW, New York,

Page 6

1   New York 10019, was examined and testified as follows:
2
3   EXAMINATION BY
4   MR. FRANCIS:
5       Q.  I'm sorry.  Would you please state and
6   spell your full name for the record.
7       A.  Adam Nager, A-D-A-M, N-A-G-E-R.
8       Q.  Mr. Nager, good morning.  My name is Jim
9   Francis.  We just met.  In fact, we met several
10  months ago, because, you may recall, I took your
11  deposition --
12      A.  Correct.
13      Q.  -- in another case.  You remember that?
14      A.  Yes.
15      Q.  Okay.  Even though I -- I gave you those
16  instructions, I'm going to give them to you again in
17  terms of how the deposition process works, so that
18  we're all on the same page here today.  Okay.
19      If I ask you a question and you don't
20  understand it, please let me know, and I'll try to
21  rephrase it in a way that's understandable to you.
22  Otherwise, I will assume that you understood my
23  question, and you're answering it to the best of
24  your ability.  Do you understand that?
25      A.  I do.

Page 7

1       Q.  Okay.  If at any point during the
2   deposition you determine that an answer that you
3   gave previously was either incorrect, inaccurate,
4   not truthful, not complete, or you think that --
5   that you need to supplement your previous answer to
6   make it make sense or be wholly truthful and
7   accurate, let me know that, and I'll be happy to
8   give you an opportunity to put that on the record.
9       Do you understand that?
10      A.  I do.
11      Q.  All right.  Even though we are not sitting
12  here in front of a judge or with a jury that would
13  hear this case, you do understand that your
14  testimony today is subject to the penalty of
15  perjury?
16      A.  Yes.
17      Q.  Okay.  Do you have any reason to believe
18  that you would not be able to give truthful and
19  accurate testimony today because of being under the
20  influence of a medication or any other substance
21  which would impair your memory?
22      A.  No.
23      Q.  Okay.  Even though you are being recorded
24  and -- on camera today, the actual official
25  transcript of the deposition today is the written

Page 8

1   transcript that's taken down by the court reporter
2   to your left.  So all of your answers today must be
3   given in a verbal fashion.  Do you understand that?
4       A.  Yes.
5       Q.  All right.  If at any point during the
6   deposition you need to -- to take a break, let me
7   know, and I'm always very accommodating for
8   something like that.  Okay?
9       A.  Okay.
10      Q.  All right.  Sir, what is your current
11  position?
12      A.  Senior compliance manager.
13      Q.  Okay.  And who is your employer?  And
14  please be as specific as possible.
15      A.  Sterling Infosystems, Inc.
16      Q.  How long have you been an employee of
17  Sterling Infosystems, Inc.?
18      A.  Since August of 2004.
19      Q.  How long have you held the title of senior
20  compliance manager?
21      A.  It's been approximately a year and a half,
22  two years.  Has it been --
23      Q.  What position --
24      A.  Actually --
25      Q.  Well, go ahead.

2  (Pages 5 to 8)

**Sanchez v. Sterling Infosystems, Inc., et al.**                    ADAM NAGER, 3/21/13

---

Page 9

1      A.  -- it may not have been that long.  I'm
2  trying to -- I don't remember the exact date, but it
3  might have been less than a year.
4      Q.  Okay.  What position did you hold
5  immediately prior to be -- becoming senior
6  compliance manager?
7      A.  Compliance manager.
8      Q.  How long were you in that position?
9      A.  Four years, five years.
10      Q.  Is compliance manager the title that you
11  would have held in or around the time period of
12  2008?
13      A.  Yes.
14      Q.  How many employees comprise the compliance
15  department at Sterling Infosystems?
16      A.  The actual compliance department in New
17  York, I would say three employees.
18      Q.  Okay.  You said "in New York"; does that
19  mean --
20      A.  There's additional employees that handle
21  other functions, including disputes, but they're --
22  they're in the -- the department, but not exactly
23  the same section, so to speak.
24      Q.  All right.  Well, let me break it down.
25          In terms of the three employees you

---

Page 10

1  mentioned that are here in New York, who are those
2  employees?
3      A.  Andrew Porter.
4      Q.  What is his position?
5      A.  General counsel.
6      Q.  Who else?
7      A.  Joe Rotondo.
8      Q.  What is his current position?
9      A.  VP of compliance.
10      Q.  Who else?
11      A.  That's it for -- myself.
12      Q.  Okay.  How long has Mr. Porter been
13  general counsel?
14      A.  A couple of months now.
15      Q.  Was there anybody before him?
16      A.  No.
17      Q.  Okay.  Would I be correct in stating that
18  prior to Mr. Porter's arrival, Sterling did not have
19  an in-house counsel?
20      A.  Correct.
21      Q.  Is the firm still using Jackson Lewis?
22      A.  Yes.
23      Q.  Has there been any change in -- in the
24  services that Jackson Lewis performs for Sterling in
25  the last couple of years?

---

Page 11

1      MR. O'NEIL:  Objection.  That -- that
2  calls for attorney/client privileged
3  communication.  I'm instructing him not to
4  answer.
5      MR. FRANCIS:  I'm not looking for any
6  communications; I'm just looking into whether
7  the relationship has changed at all.
8      MR. O'NEIL:  What dates -- changed from
9  what date?
10      Q.  Say 2010.
11      A.  Not to my knowledge.
12      Q.  Okay.  Now, when -- when I was asking you
13  about the employees who are -- who comprise the --
14  the compliance department, you mentioned the three
15  names, including yourself, that are in New York
16  City, but then you mentioned some other ones.  Can
17  you tell me the names of those people?
18      A.  It's headed up by Veronique Laverdiue.
19      Q.  Could you spell that or try.
20      A.  Let me see if I have --
21      MR. O'NEIL:  Just do your best.
22      MR. FRANCIS:  Yeah.
23      A.  L-A-V-E-R-D-I-U-E.
24      Q.  Okay.  Does that one -- is that -- is that
25  a last name or a first name?

---

Page 12

1      A.  That's her last name.
2      Q.  That's her last name, Laverdiue?
3      A.  Yes.
4      Q.  Okay.
5      A.  Veronique is her first name.
6      Q.  Okay.  And when you say "it's headed up,"
7  what's the "it" that you're referring to?
8      A.  She heads up a team that completes
9  applicant disputes.
10      Q.  And how large is that team?
11      A.  Six to eight people.
12      Q.  Are they located in the United States?
13      A.  They're in Ohio.
14      Q.  And what is the office that they work out
15  of?  What do you call that office?
16      A.  Just Ohio office.
17      Q.  And when you said "applicant disputes," do
18  you mean they handle disputes that are initiated by
19  a consumer who is applying for a job and thinks
20  there's something inaccurate or incorrect about them
21  on their Sterling report?
22      A.  Correct.
23      Q.  Okay.  Do you have any involvement in that
24  process, handling consumer disputes?
25      A.  Almost none.

---

3  (Pages  9 to 12)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 13

1      Q.   Okay.
2      A.   Occasionally, I'll be asked input on a
3    case, but --
4      Q.   Okay.  Let's start with your current
5    position as senior compliance manager.  Would you
6    give me a full description of your job duties and
7    responsibilities, please.
8      A.   Doing research on the type of background
9    checks required for certain industries; some best
10   practice recommendations to clients, depending on
11   what they do; evaluating forms; working with Jackson
12   Lewis; and recommendations for clients.  I'll handle
13   some attorney-initiated disputes.
14     Q.   Anything else?
15     A.   That's pretty much it.
16     Q.   Okay.  Let me ask you to break that down a
17   little bit.  One of the things you mentioned that
18   you do is you do research?
19     A.   Correct.
20     Q.   Can you tell me the type of research
21   you're referring to.
22     A.   For example, in healthcare what type of
23   background check is required for nurses in a
24   facility working with mentally disabled.
25     Q.   You determine what type of background

Page 14

1    check is required for your clients?
2      A.   Correct.
3      Q.   Okay.  And then tell them:  This is what
4    you need to do?
5      A.   Correct.
6      Q.   Okay.  What other type of research?
7      A.   That's the main example for research in
8    that respect.  New laws, we'll research that when
9    they get passed or are pending.
10     Q.   Would it be fair for me to state that in
11   connection with your job, you have familiarity with
12   the Fair Credit Reporting Act?
13     A.   Yes.
14     Q.   Is that one of the laws that you are
15   required to know about in connection with your job?
16     A.   Yes.
17     Q.   Sterling is a consumer reporting agency;
18   correct?
19     A.   Yes.
20     Q.   Okay.  And it's regulated by the Fair
21   Credit Reporting Act?
22     A.   Correct.
23     Q.   And one of the things you do is help the
24   company try to comply; correct?
25     A.   Correct.

Page 15

1      Q.   You mentioned that -- I think the words
2    you used was that one of the other things you do in
3    your job is you do -- advise clients as to best
4    practices or best practice evaluations.  Can you
5    tell me what you mean by that.
6      A.   Okay.  Clients will ask what type of
7    positions do we feel you can run credit reports on.
8    And our response would be something possibly
9    fiscally responsible positions, such as a CFO,
10   someone who's handling large amounts of cash, that
11   sort of thing.
12     Q.   Okay.  And one of the other things you
13   mentioned that you do is you evaluate forms; right?
14     A.   Correct.
15     Q.   Can you tell me the type of forms that you
16   were referring to?
17     A.   Clients will often have their own consent
18   forms, possibly pre- and final adverse action
19   letters.
20     Q.   You're saying some clients have their own
21   forms; correct?
22     A.   Correct.
23     Q.   And other clients, you supply the forms
24   for; correct?
25     A.   Correct.

Page 16

1      Q.   Okay.  And other than the consent forms
2    and pre-adverse action -- pre- and final adverse
3    action letters, were there any other forms you're
4    referring to when you mentioned that part of your
5    job involves evaluating forms?
6      A.   Those are -- those are the most common.
7    Occasionally, we'll get background check policies,
8    but we don't really do too much of that.
9      Q.   Okay.
10     A.   Occasionally an application.
11     Q.   Now, in terms of evaluating forms, do you
12   mean to say that a client may give you a form and
13   say, Hey, this is what we use for our consent forms
14   and this what we use for final adverse action
15   letter, please take a look at it and tell us if you
16   think it -- it's works; right?
17     A.   Correct.
18     Q.   Okay.  And that's what you do; right?
19     A.   One of things, yes.
20     Q.   Okay.  And would I be correct in -- in
21   stating that in order to do that for your clients,
22   you, yourself, have had to become familiar with
23   those provisions of the Fair Credit Reporting Act
24   which relate to those forms?
25     A.   Correct.

4  (Pages 13 to 16)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 17

1    Q.  Okay.  And if you think a client's
2  particular form is not compliant with the law,
3  you'll tell them that; correct?
4    A.  Yes.
5    Q.  If you think that there's something they
6  could do better to achieve their goals, you'll tell
7  them that as well; correct?
8    A.  Correct.
9    Q.  In terms of the clients that -- who don't
10  handle their own forms and for whom Sterling does
11  the forms, are you involved in that process?
12    A.  The -- in -- in what way?
13    Q.  In the drafting or the editing of any
14  forms for those clients?
15    A.  The edits typically come from Jackson
16  Lewis, and we just add them into our form and then
17  distribute them.
18    Q.  Well -- so if -- okay.  Strike.
19      For the clients who do not use their own
20  forms, is it your testimony that Sterling will
21  provide forms for those clients to use?
22    A.  Yes.
23    Q.  Okay.  And you mentioned the word "consent
24  forms"; can you tell me what you mean, so we're on
25  the same page, by "consent forms"?

Page 18

1    A.  A consent and disclosure authorization to
2  do the background check.
3    Q.  Are you talking about the form that a
4  consumer is supposed to sign prior to a company
5  running a background check on them?
6    A.  Correct.
7    Q.  Okay.  And by "consent form," you're
8  referring to the form where the consumer is giving
9  the employer consent to obtain a background check on
10  that consumer; correct?
11    A.  Correct.
12    Q.  Okay.  And I know you mentioned Jackson
13  Lewis typically designs those forms, but I think
14  you've mentioned, correct me if I'm wrong, that one
15  of the things that you do in your job is to help
16  distribute that to the clients?
17    A.  Not -- I don't distribute them directly to
18  the clients.  There's very few clients I work with
19  directly.  I would distribute them to -- it now goes
20  to out -- with -- with Salesforce, and it's
21  distributed to our account management team, client
22  service team, who actually distributes it.
23    Q.  I see.  So you're distributing the form to
24  other Sterling employees for them to then give it to
25  the clients?

Page 19

1    A.  Correct.
2    Q.  Okay.  And how do you do that?  Do you
3  send e-mails?
4    A.  Typically e-mail.
5    Q.  Okay.  Focusing just upon the -- the
6  consent forms, have those forms changed over time?
7    A.  Yes.
8    Q.  Okay.  And are those changes prompted by
9  Jackson Lewis?
10    A.  Typically, yes.
11    Q.  Okay.  Do you maintain a library or
12  database of the forms that the client has used over
13  the course of time that pertain to the consent
14  disclosure forms?
15    A.  Not all versions.
16    Q.  Okay.  What -- do you - do you retain some
17  of them?
18    A.  Some of them, yes.
19    Q.  Okay.  What versions do you retain?
20    A.  By -- they're just listed by date.
21  There's no way to really describe them.
22    Q.  Okay.  Where -- where are those -- in
23  other words, if you wanted to -- to look at, for
24  example --
25    A.  Okay.

Page 20

1    Q.  Wait.  Hang on one second.  If you wanted
2  to find out, for example, what form were we using in
3  August of 2010, okay, where would you go to see that
4  information?
5    A.  We have a H share drive where some of the
6  forms are kept.
7    Q.  H?
8    A.  It's just a drive on a network.
9    Q.  Okay.  And what is the folder called that
10  you would access to see that form?
11    A.  It's H drive interdepartmental share
12  consent forms, something like that.
13    Q.  In what form are those forms contained in?
14  In other words, are they in an Excel spreadsheet;
15  are they Word forms?  What -- what's the --
16    A.  Just the Word documents.
17    Q.  Word documents.
18      And does -- and does the H share drive,
19  does it list the forms by date?
20    A.  You can list it like that if you wanted
21  to, just sort it.
22    MR. O'NEIL:  Mr. Francis, as you know,
23  your firm recently issued a Rule 30b6
24  deposition notice for one of the 19 topics that
25  you were seeking testimony on related to the

5 (Pages 17 to 20)

Sanchez v. Sterling Infosystems, Inc., et al.                     ADAM NAGER, 3/21/13

Page 21

1  policies and procedures of Sterling Infosystems
2  regarding its consent and disclosure forms.
3  We're still in the process of trying to reach
4  an agreement on all the other aspects of that
5  deposition notice. Mr. Nager hasn't been
6  prepared to testify in response to that topic,
7  as you could appreciate, and we haven't told
8  you that -- that he will be testifying. But,
9  obviously, you know, to the extent he's
10  providing testimony on that, we would believe
11  that that would be responsive to the Rule 30b6
12  notice.
13       MR. FRANCIS: Are you -- oh, so you -- are
14  you designating him for that?
15       MR. O'NEIL: No, I'm not, because I
16  haven't prepared him for that.
17       MR. FRANCIS: Okay.
18       MR. O'NEIL: But, you know, obviously, I
19  just want to put you on notice that, obviously,
20  you're going down this road and you have every
21  right to ask him these questions, but, you
22  know, I may come to the conclusion later on
23  that -- well, it doesn't really matter. I just
24  want to remind you that that's a subject of
25  your pending deposition notice.

Page 22

1       MR. FRANCIS: I'm aware of that. And the
2  reason I'm asking him is because he's outlined
3  that that's one of the things he does. And
4  what I'm really exploring right now is what he
5  does for the company and his background. So I
6  understand --
7       MR. O'NEIL: Well, it sounds like you're
8  actually exploring, you know, the -- the
9  computer drives and folders, where those forms
10  are, but in any event, go ahead.
11       MR. FRANCIS: Okay.
12
13  BY MR. FRANCIS:
14       Q. Now, you mentioned that this -- this share
15  drive or this H drive that you have access to --
16       A. Okay.
17       Q. -- in connection with your job at
18  Sterling, what databases do you have access to?
19       A. What do you mean by "what databases"?
20       Q. Well, what drives -- I know that you have
21  access to the share drive. In other words, in
22  connection with performing your duties at the
23  company, would I be correct in stating that you have
24  access to, at least, one or more of the databases
25  that the company maintains?

Page 23

1       A. Yes.
2       Q. Can you tell me what databases you have
3  access to?
4       A. My documents which is stored on my
5  computer and also on the network.
6       Q. Okay.
7       A. The compliance share drive. Salesforce.
8       Q. Anything else?
9       A. The main — main drive, certain
10  different -- certain sections. All the
11  interdepartmental shares.
12       Q. Do you have access to the database out of
13  which the company provides background checks?
14       A. The tracker database I have access to,
15  which has the background checks for Sterling East.
16  Also, the Sterling West system that does background
17  checks.
18       Q. Okay. Sticking with your job duties and
19  responsibilities and as you've described them. One
20  of the other things you mentioned that you do is you
21  make recommendations for client's; correct?
22       A. Correct.
23       Q. Can you tell me what you meant by that.
24       A. Again, the credit example, what type of
25  positions to run credit reports on.

Page 24

1       Q. Okay. Anything else?
2       A. Say for services, somebody might ask what
3  kind of -- to verify a professional license, such as
4  a bar exam. See if someone -- for an attorney, that
5  could be another recommendation.
6       Q. As part of your job duties and
7  responsibilities, do you have the authority to make
8  suggestions to the company?
9       A. To my company or to —
10       Q. To your company.
11       A. I can make suggestions, but it doesn't
12  mean they'll be taken.
13       Q. Is it -- is it part of your job to make a
14  recommendation of a change in policy if you think
15  one needs to occur?
16       A. Yes.
17       Q. Have you done that in the course of your
18  employment at the company?
19       A. Yes.
20       Q. And I believe the last thing that you
21  mentioned that you do is attorney disputes?
22       A. Correct.
23       Q. Can you tell me what you mean by that?
24       A. If a letter was to come in from an
25  attorney disputing a background check, rather than

6 (Pages 21 to 24)

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 25

1   the applicant disputing the background check, I
2   would correspond with the attorney.
3       Q.   Okay.  So are -- if -- if the consumer
4   retains a -- an attorney for the purpose of making a
5   dispute about an error in a background check, and
6   they send that to Sterling, does that get forwarded
7   to you?
8       A.   Yes.
9       Q.   Okay.  And what is your role in handling
10  that dispute?  What are you supposed to do?
11      A.   I'll correspond with the attorney.  I'll
12  forward the background -- the order number and
13  the -- whatever the dispute is to our dispute team
14  who will investigate it, then I'll correspond back
15  with the attorney when -- when it's resolved or
16  whatever the outcome is.
17      Q.   Do you have any input in terms of
18  determining whether or not a dispute should be or
19  that an error should be corrected or anything like
20  that?  Do you have any involvement in that?
21      A.   Almost none.
22      Q.   Okay.  Is part of your job to answer any
23  questions that other Sterling employees may have
24  regarding its compliance procedures?
25      A.   Yes.

Page 26

1       Q.   So if somebody from another department has
2   a question about one of Sterling's policies or
3   procedures for complying with the Fair Credit
4   Reporting Act, and they called you, it's within
5   your -- scope of your -- your job duties to -- to
6   answer that question; correct?
7       A.   Yes, I'd explain it to him.
8       Q.   Okay.  And in connection with your job as
9   either compliance manager or senior compliance
10  manager, have you had any role in drafting or
11  creating any memoranda or policy-related documents
12  for the company?
13      A.   No, I typically don't draft document
14  policy or work procedures.
15      Q.   Okay.  How about e-mail documents?
16          MR. O'NEIL:  Objection.  Vague.
17      Q.   You can answer.
18      A.   Okay.  What do you mean by "e-mail
19  documents"?
20      Q.   Well, as part of your job, has part --
21  does part of your job, at all, involve sending
22  e-mails to other company employees either clarifying
23  or stating Sterling policies?
24      A.   Not really.
25      Q.   No?

Page 27

1       A.   I might be asked a question about a
2   policy, but typically policy development wouldn't
3   come from me.
4       Q.   If there were a change in the law, for
5   example, and that information is supposed to be
6   communicated to other Sterling employees, would you
7   have any role in helping to distribute that
8   information?
9       A.   Yes.
10      Q.   Okay.  So -- and -- and how would you do
11  that?  Would you do that by e-mail or --
12      A.   It depends on what the -- what the
13  situation would be.  It would probably be discussed
14  with Joe Rotondo.  And then it would either -- we
15  draw up a communication, and then it would be
16  distributed via e-mail or via Salesforce now.
17      Q.   Okay.  And is part of your -- is part of
18  your job, as either senior compliance manager or
19  previously as compliance manager, to act as a
20  liaison between the company and Jackson Lewis?
21      A.   Yes.
22      Q.   And what is your role and responsibility
23  regarding interacting or interfacing with Joe
24  Rotondo?
25      A.   He's my supervisor.

Page 28

1       Q.   Is he who you report to?
2       A.   Yes.
3       Q.   Do you have any employees who report to
4   you?
5       A.   No.
6       Q.   In connection with your job as either
7   compliance manager or senior compliance manager,
8   have you developed any familiarity with the types of
9   information that appears on the background checks
10  that Sterling sells to its clients?
11      A.   Yes.
12      Q.   And have you become familiar with the
13  formatting and the appearance of the background
14  checks that Sterling sells to its clients?
15      A.   Yes.
16      Q.   Are you familiar and/or have you gained
17  familiarity with the process that occurs in response
18  to a client requesting a background check on a
19  particular job applicant?
20      A.   Yes.
21      Q.   Are you -- do you have familiarity with
22  the databases and/or data sources for the
23  information which is published on a Sterling
24  background check?
25      A.   Some, not all.

7  (Pages 25 to 28)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 29

1    Q.  Which ones are you -- what -- what
2  familiarity do you have?
3    A.  Well, education institutions, you go
4  direct via institution in most cases, but in terms
5  of criminal, there's different jurisdictions.  Some
6  county searches I know, some state searches I know,
7  others I don't know as well.
8    Q.  Sterling uses a -- a database for its
9  nationwide search; correct?
10    A.  Yes.
11    Q.  Okay.  Are you familiar with that source?
12    A.  Yes.
13    Q.  Okay.  And in terms of the nationwide
14  data -- data source that Sterling uses, is it still
15  using Acxiom?
16    A.  No.
17    Q.  When did that end?
18    A.  A couple of months ago.
19    Q.  And what does it use -- who does it use
20  now?
21    A.  I believe it's Experian.
22    Q.  Do you know the date more precisely?
23    A.  No.
24    Q.  Am I correct, though, that even though
25  the -- the source of the data has changed from

Page 30

1  Acxiom to Experian, that the data from which
2  Sterling gets information for the nationwide part of
3  its search comes from a database maintained by
4  Experian?
5    A.  Yes.
6    Q.  Okay.  It is not getting that data
7  directly from courts; correct?
8    A.  Correct.
9    Q.  Okay.
10    MR. O'NEIL:  You say "it"; you meant
11  Sterling, not Experian; right?
12    Q.  Sterling is getting it not from the
13  courts; right?  It's getting it from -- from
14  Experian; correct?
15    A.  Correct.  Yes.
16    Q.  Do you know -- who at the company would
17  be, in your mind, the most familiar -- the person
18  most familiar with the type of data that Sterling
19  obtains from Experian regarding the nationwide
20  search?
21    A.  Probably Glen Rambarron.
22    Q.  Okay.
23    THE COURT REPORTER:  Glen?  What was his
24  last name?
25    THE WITNESS:  R-A-M-B-A-R-R-O-N.  Probably

Page 31

1  not correct, but it's close.
2    Q.  What's his title or position?
3    A.  Something in vendor management.
4    Q.  Okay.  In connection with coming to
5  testify here today, did you review any documents?
6    MR. O'NEIL:  I object.  I would ask you to
7  exclude from your answer beyond this question
8  any documents that you reviewed with me or that
9  I showed to you.  But you go ahead, you could
10  answer the question.
11    A.  Just a couple of -- the -- the Sanchez
12  background check report.
13    Q.  Okay.  You reviewed a report -- a
14  background check that Sterling performed on the
15  plaintiff in this case, Mr. Sanchez?
16    A.  Correct.
17    Q.  Okay.  Any other non-attorney client
18  documents; right?  In other words, I -- I don't want
19  to know anything that -- what came from Mr. O'Neil's
20  office.  Okay.  But I am curious about any documents
21  that Sterling maintains.
22    A.  No.
23    MR. O'NEIL:  Again, same instruction.  I
24  would not ask -- I'd ask you not to reveal the
25  documents that I showed you in preparation for

Page 32

1  the deposition.
2    A.  No, I did not.
3    Q.  Okay.  Did you review any of the consent
4  and disclosure forms that the company has used over
5  the course of time?
6    A.  No.
7    MR. O'NEIL:  Same instruction.
8    A.  No.
9    Q.  No.
10    Did you review any memoranda that -- or
11  e-mail correspondence that you authored?
12    A.  No.
13    Q.  Okay.  Other than speaking with Mr. O'Neil
14  or -- or somebody from his office, did you discuss
15  your deposition today with anyone at the company?
16    A.  What do you mean by "discussed"?  I said
17  that I was going, but not --
18    Q.  And who did --
19    A.  -- not in preparation of.
20    Q.  Okay.  Who did you talk to?
21    A.  Joe Rotondo.
22    Q.  Anybody other than Mr. Rotondo?
23    A.  No.
24    Q.  Okay.  Prior to -- telling him that you
25  were going to come here to testify today, did you --

8  (Pages 29 to 32)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 33

1   have you discussed this case with Mr. Rotondo?
2        A.   Yes.
3        Q.   On how many different occasions?
4        A.   Five, six, maybe more.
5        Q.   And what would have been the topic of your
6   discussions?
7            MR. O'NEIL:  I -- I would ask Mr. Nager to
8        exclude from his answer any discussions where
9        either lawyers were present or the discussions
10       were driven by questions asked by the lawyers.
11       Q.   Mr. O'Neil is correct with that.  So if
12  you talked to Mr. Rotondo by yourself, on the phone,
13  at the office, and no one else is around, I want to
14  know that.  If Mr. O'Neil is --
15       A.   Okay.
16       Q.   -- there, don't tell me about that.
17           MR. O'NEIL:  Oh, no, my instruction was
18       larger than that.  If you had that -- if you
19       had that conversation because you were trying
20       to assist counsel or you had the conversation
21       at the request of counsel, I would also ask you
22       to exclude those conversations from your
23       answer.
24       A.   Okay.  Probably when the initial dispute
25  came in -- well, not when the initial dispute came

Page 34

1   in, but when the lawsuit came in, we probably
2   discussed it.  And then afterwards, when
3   investigating the case in further detail, we would
4   discuss it again to see what the situation was.
5        Q.   Okay.  Is - is part of your -- does - does
6   any part of your job involve assisting the company
7   with defense of litigation?
8        A.   What do you mean by that?
9        Q.   Either gathering information?
10       A.   Yes.
11       Q.   So -- okay.  So it's one of the things
12  that's -- if somebody sues Sterling, either an
13  individual case or a class action, you -- you and
14  Mr. Rotondo will have a role in that; correct?
15       A.   Correct.
16       Q.   Okay.  And one of the things you'll do is
17  you'll gather documents for the lawyers; correct?
18       A.   Correct.
19       Q.   Okay.  And is another thing that you will
20  do is perform an investigation to find out what
21  happened at the company?
22       A.   Yes.
23       Q.   Okay.  Do you -- do you make any decisions
24  regarding what to do about an -- an existing
25  lawsuit?

Page 35

1            MR. O'NEIL:  Objection.  Vague.
2        Q.   You can answer.
3        A.   No -- that would really -- any lawsuits
4   that come in that -- decisions to be made, would
5   probably be made by Joe Rotondo, Andrew Porter, at
6   this point.  The other executives would be involved
7   as well, along with attorneys.
8            MR. FRANCIS:  Okay.  Can you shut off the
9        video for a second.
10           THE VIDEOGRAPHER:  10:41.  Off the record.
11
12           (A recess was taken.)
13
14           THE VIDEOGRAPHER:  It's 10:44.  On the
15       record.
16               - - -
17  BY MR. FRANCIS:
18       Q.   Just to ask -- just to -- to finish some
19  questions about your job duties and your position at
20  the company.
21           Does any part of your job, or has any part
22  of your job since you've been a compliance manager
23  at Sterling, involve overseeing the -- the company's
24  compliance procedures regarding Section 1681k of the
25  Fair Credit Reporting Act?

Page 36

1            MR. O'NEIL:  Objection.  Vague.
2        A.   Can you explain further, please.
3        Q.   Sure.  Are you familiar with something
4   called a 613 letter?
5        A.   Yes.
6        Q.   Okay.  What is your understanding of that?
7        A.   If you're sending -- if you're getting
8   information from a database, you send it out to the
9   consumer, the 613 letter.
10       Q.   Okay.  And so -- just so we're on the same
11  page here, you're referring to Section 613 of the
12  Fair Credit Reporting Act; correct?
13       A.   Yes.
14       Q.   Okay.  When you say that, that's what you
15  mean; right?
16       A.   Yes.
17       Q.   Okay.  Are you familiar with what your
18  company does, if anything, to comply with Section
19  613 of the Fair Credit Reporting Act?
20       A.   We do primary source search from -- for
21  any record that's found in a database.
22       Q.   Okay.  What does that mean?
23       A.   We go direct to the county or the state.
24       Q.   Okay.  Is -- are you saying that you --
25  that the company does not send 613 letters?

9  (Pages 33 to 36)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

---

Page 37

1    A.  Correct.
2    Q.  For any client?
3    A.  There may be some exceptions, but the
4  majority of them, I think, have been stopped.
5    Q.  Okay.  Would you agree with me that at one
6  point your company did send 613 letters?
7    A.  Yes.
8    Q.  Do you know when that process ceased?
9    A.  No.
10   Q.  Do you know whether that was employer
11 by -- or -- in a -- a client-by-client situation or
12 whether that was a time period issue?
13   A.  Majority of it was a time period, and
14 it -- the majority of clients were switched over.
15        There were probably some holdovers that
16 were done slowly after the initial time period
17 change.
18   Q.  Okay.  Is it your testimony today that the
19 company does not send 613 letters for anything?
20   A.  No.  They may still --
21   Q.  What's --
22   A.  -- they may still -- they may still do it
23 for some clients.
24   Q.  Okay.  Does your company send 613 letters
25 in connection with the nationwide Experian based

---

Page 38

1  search?
2        MR. O'NEIL:  Objection.  Vague.
3    Q.  You can answer.
4        MR. O'NEIL:  Assumes facts not in
5  evidence.
6    A.  Again, there could be some exceptions, but
7  the majority of clients, no.
8    Q.  Okay.  And is it your testimony that
9  the -- the way that your company test -- or -- or
10 complies with Section 613 of the Fair Credit
11 Reporting Act is by ensuring strict procedures?
12   A.  Correct.
13   Q.  Okay.  Rather than sending the letter;
14 correct?
15   A.  Correct.
16   Q.  Okay.
17   A.  It's the primary source search.
18   Q.  And just to be clear, when you say
19 "primary source search," you mean the actual what?
20   A.  After doing the nationwide, we'll follow
21 it up with a county or a state search to confirm the
22 information.
23   Q.  Okay.
24        MR. FRANCIS:  Let's mark this as
25 Plaintiff's Exhibit Number 1, please.

---

Page 39

1
2
3        (Plaintiff's Exhibit 1,
4        STERLING TESTING SYSTEMS DOCUMENT,
5        BATES STAMP NOS. DEF00001 --
6        DEF00007, was marked for identification.)
7
8    Q.  Mr. Nager, I'm handing you a document that
9  has been marked as Plaintiff's Exhibit Number 1.  My
10 intention is to ask you some questions about it, but
11 before I do I want to make sure you understand what
12 it is and you can testify about it.  So please take
13 a minute, take a look at it.  It should have the
14 numbers DEF-1 through 7 in the lower right corner.
15 Please take a moment to look at it and tell me when
16 you're ready for me to ask you questions about it.
17   A.  (Witness reviews document.)  Okay.
18   Q.  Are you ready?
19   A.  I am.
20   Q.  Can you identify this document?
21   A.  This is the Jose Sanchez -- well, two Jose
22 Sanchez reports.
23   Q.  Okay.  Is this the document that you
24 testified earlier about that you reviewed prior to
25 coming here to testify today?

---

Page 40

1    A.  Yes.
2    Q.  Okay.  And this is a -- we're looking at
3  two reports that Sterling prepared regarding Jose
4  Sanchez; correct?
5    A.  Correct.
6    Q.  All right.  And in this case the reports
7  were -- were sold to a client of Sterling Testing
8  Systems, SBM Site Services; correct?
9    A.  Correct.
10   Q.  All right.  And are you able to identify
11 when Sterling sold this background check about Mr.
12 Sanchez?
13   A.  It looks like August of 2010.
14   Q.  Okay.  Now, before we get into Mr.
15 Sanchez's information, or the information that
16 supposedly -- supposedly pertains to him, I want to
17 ask you some questions about the formatting of this
18 report.
19   A.  Okay.
20   Q.  Do you remember when I asked you
21 previously whether or not you were familiar with
22 the -- the general formatting of Sterling background
23 checks?
24   A.  Yes.
25   Q.  Okay.  Is -- is the report that Sterling

---

10  (Pages 37 to 40)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 41

1  sold about Mr. Sanchez to SBM Site Services typical
2  of the format that it prepares for other clients?
3      A.  For Sterling East clients, yes.
4      Q.  Okay.  What do you mean by "Sterling East
5  clients"?
6      A.  Sterling West and Sterling Ohio are on
7  different platforms.  The reports look different.
8      Q.  Okay.  Let's -- okay.  When you say
9  "Sterling East," what does that mean?
10      A.  It would be reports that are run through
11  our tracker system and clients that sign on to our
12  east portal.
13          THE COURT REPORTER:  I'm sorry?
14          THE WITNESS:  Tracker system.
15      A.  And the clients sign on to our east
16  system.
17      Q.  Okay.  And now, is that -- is that
18  division based geographically?  You keep saying,
19  "Sterling East," so does that mean to suggest that
20  the clients that get reports like this are from the
21  east, or can you be a little more specific about the
22  breakdown?
23      A.  The -- when we say "the east platform,"
24  those are clients that signed up with Sterling, and
25  they weren't either signed up with one of the other

Page 42

1  companies that we acquired or transferred over to
2  one of the other company's platforms.
3      Q.  I see.  So these are original Sterling
4  clients --
5      A.  Correct.
6      Q.  -- largely?
7      A.  A majority of them, yes.
8      Q.  As opposed to clients of Acxiom
9  Information Systems, right, things like that?
10      A.  Correct.  Yes.
11      Q.  All right.  Okay.  So for the Sterling
12  East system, right, the Sanchez report that it sold
13  to SBM is typical of the format of the -- of the
14  reports it would sell to other employers; correct?
15      A.  Correct.
16      Q.  Okay.  Anything atypical about the format?
17      A.  No.
18      Q.  Okay.  Okay.  Let me -- I just want to
19  take you through this report a little bit.  Okay?
20      A.  Okay.
21      Q.  If you look at the first heading, "Subject
22  Profile," do you see that?  This, right here.
23  (Indicating.)
24      A.  Yes.
25      Q.  Okay.  What information, typically, is in

Page 43

1  this part of the report?
2      A.  Name, address, social security number,
3  depending on which view we see it in.  Date of
4  birth.  Phone sometimes, but not often.  It might
5  have a previous address.
6      Q.  Okay.  Is the information that's contained
7  in "Subject Profile," is that information that comes
8  from the employer, or is that information provided
9  by Sterling or both?
10      A.  It depends on the situation.
11      Q.  How about this situation?
12      A.  Can't tell.
13      Q.  Okay.  Does this -- does the information
14  contained under "Subject Profile," does this include
15  input data from the employer?
16      A.  It could either be inputted -- that's why
17  I can't tell you.  You can you either input by the
18  employer, or it could have been in -- inputted by
19  Sterling.
20      Q.  Okay.  In what instances would it be
21  inputted by Sterling?
22      A.  Some clients would just fax us the
23  information.  We might get the consent form faxed to
24  us, if they have a standard order, or it might even
25  have like an order cover sheet, and then we would

Page 44

1  input it.
2      Q.  I see.  Do -- do some clients simply put
3  the input data in by themselves online?
4      A.  The majority of them do.
5      Q.  Okay.  But other ones will fax you the --
6  the client's information and -- and then you guys do
7  it; right?
8      A.  Yes, but that's a minority at this point.
9      Q.  And is the information that is used to run
10  the report by Sterling, is that information that is
11  contained on the consent disclosure information?
12      A.  Majority of the time, yes.
13      Q.  Okay.  All right.  And then if you go down
14  to the next -- the second -- the third heading,
15  "Result Status."  Can you tell me what information
16  is typically contained in that section of the -- of
17  the report.
18      A.  It lists out the services and a summary of
19  the findings.
20      Q.  Okay.  And the services are on the left;
21  correct?
22      A.  Correct.
23      Q.  All right.  And one of the services listed
24  here is a "criminal."  Do you see that?
25      A.  Correct.

11 (Pages 41 to 44)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 45

1      Q.   Is that a -- is that a standard type of
2  service that Sterling will provide for its clients?
3      A.   Yes.
4      Q.   All right.  And what -- what typically is
5  contained in a criminal report?
6      A.   The most common would be county searches.
7      Q.   Okay.  And that was done in this case;
8  right?
9      A.   Correct.
10     Q.   All right.  And is that something that's
11 typically run, criminal?
12     A.   Yes.
13     Q.   All right.  And under the finding there's
14 the word "alert."  Do you see that?
15     A.   Correct.
16     Q.   All right.  And what does that
17 communicate?
18     A.   Basically, that the client should look at
19 it.
20     Q.   Okay.  What determines whether or not it
21 gets an alert or gets a clear?
22     A.   If there's nothing found, it's a clear.
23 If it's anything reportable to a client, it would
24 get an alert.
25     Q.   Okay.  It doesn't matter whether it's a

Page 46

1  misdemeanor or felony?
2      A.   Correct.
3      Q.   Okay.
4      A.   There's some minor, let's say, traffic
5  violations that wouldn't be -- that would be
6  transmitted to a client.
7      Q.   Okay.  And is Sterling the one who comes
8  up with the word "alert"?  That's Sterling's
9  language; right?
10     A.   Correct.
11     Q.   All right.  And that's Sterling's finding;
12 correct?
13     A.   Yes.
14     Q.   All right.  And then underneath that there
15 is an "SS trace" service.  Do you see that?
16     A.   Correct.
17     Q.   What is that service?
18     A.   It's basically used to figure out where to
19 run the criminal history searches.
20     Q.   Okay.  And is that a service which is
21 typically run in connection with a background check?
22     A.   Majority of our clients do.
23     Q.   Okay.  Not unusual --
24     A.   Yes.
25     Q.   -- correct?

Page 47

1      A.   Correct.
2      Q.   All right.  Now, if you go under the
3  word -- under the heading "criminal results," and
4  then under that "report," right, there's information
5  which appears here; correct?
6      A.   Correct.
7      Q.   Can you summarize the information which
8  appears here?
9      A.   It has the applicant's name, Jose Sanchez;
10 some of their information, the charges, the plea,
11 the disposition, sentence.
12     Q.   Okay.  So am I correct that in connection
13 with this background check that Sterling sold to SBM
14 about Mr. Sanchez, it reported one or more records?
15     A.   Correct.
16     Q.   All right.  And it reported a -- here,
17 what, a misdemeanor record?
18     A.   Yes.
19     Q.   Okay.  Now, there are dates at the top of
20 that record.  If you look status, "closed, open date
21 and time."  Can you tell me what those times mean?
22     A.   The "open date and time" is when the
23 search was initiated.  The "close date and time" is
24 when we closed it in our system.  And that
25 particular county search was considered complete.

Page 48

1      Q.   Okay.  And the -- the record here, not the
2  specific one, but is the information about this
3  misdemeanor, is this typical of the way such
4  information would look?
5      A.   Yes.
6      Q.   All right.  Anything unusual or atypical
7  about the way this particular criminal record looks
8  here?
9      A.   The only thing is that the date of birth
10 on court file is not complete.
11     Q.   Where do you -- where are you looking at
12 that?  I see.  You're --
13     A.   "Date of birth on court file."
14     Q.   Okay.  What information is usually there?
15     A.   Sometimes we'll get -- usually, we'll get
16 more information.  We'll get the full date of birth.
17     Q.   Where is that coming from?  Is that coming
18 from the court?
19     A.   Correct.
20     Q.   Okay.  So in response to this request from
21 SBM, Sterling did something to retrieve this record;
22 right?
23     A.   Yes.
24     Q.   Can you tell me -- are you -- are you able
25 to tell me what would have been done to return this

12 (Pages 45 to 48)

Sanchez v. Sterling Infosystems, Inc., et al.                                    ADAM NAGER, 3/21/13

Page 49

1    record?
2        A.  For this jurisdiction, I can't
3    specifically say how we fulfill it.  But we would
4    contact the court or whatever state agency or county
5    agency that we went to, and either through a
6    computer terminal, integration, computer Web site or
7    court -- court researcher, get the information and
8    bring it back.
9        Q.  Okay.  Are you saying that in connection
10   with a request for a background check like this one
11   by SBM, that somebody at Sterling logs into a
12   court's system online and tries to grab the --
13   obtain the record?
14       A.  It depends on the jurisdiction, but that's
15   one method.
16       Q.  Okay.  Now, do you know whether or not
17   when the record -- when it -- when it does that --
18   strike that.
19           Are you able to tell in -- in this
20   particular case whether that's how this was done?
21       A.  No.
22       Q.  Are you able to tell whether or not this
23   was accessed online or whether somebody went to the
24   courthouse or otherwise?
25       A.  That, I don't know.

Page 50

1        Q.  Okay.  Am I correct that -- that generally
2    if somebody is going -- somebody from Sterling is
3    going to fulfill a background request, the majority
4    of the time they're going to try to do that online?
5        A.  Majority we -- we try and accomplish
6    through integrations.
7        Q.  Okay.
8        A.  Others, we'll go to the court Web sites,
9    that's another popular method.
10       Q.  Okay.  When you say "integrations," what
11   do you mean by that?
12       A.  It's a computer system that would,
13   basically, retrieve the information.
14       Q.  I see.  From the court record?
15       A.  Correct.
16       Q.  Okay.  So the court -- so the system is
17   doing it itself; is that what you're saying?
18       A.  I would say -- say that, yes.
19       Q.  Okay.  And is the information that the --
20   that Sterling is getting from the court record, the
21   actual full, complete file or just the summary
22   information which is available online?
23           MR. O'NEIL:  Objection.  Vague.  Assumes
24   facts not in evidence.
25       Q.  You can answer.

Page 51

1        A.  It depends on the jurisdiction, I would
2    say.  Some jurisdictions probably have more
3    information online than others.
4        Q.  Okay.  But -- but somebody is not going
5    and -- and photocopying the entire court file;
6    correct?
7            MR. O'NEIL:  Objection.  Are you asking
8    about this particular report you put in front
9    of him or generally?
10       Q.  Well, I'm asking you generally.
11       A.  In some cases we do send researchers;
12   other cases we don't.
13       Q.  Okay.  And when you don't, you're actually
14   getting the -- the information that's available
15   online; correct?
16       A.  Correct.
17       Q.  All right.  And if that's not the actual
18   full file, you're just getting the information
19   that's online; correct?
20           MR. O'NEIL:  Objection.  Vague.  Assumes
21   facts not in evidence.
22       Q.  You can answer.
23       A.  After -- if we don't have complete
24   information, and we can't -- can't figure out if
25   we're supposed to be reporting it, we would send --

Page 52

1    then have to send a researcher.
2        Q.  Okay.
3        A.  Or try and call.  We would try that first.
4        Q.  But if you're able to get information, but
5    it's about the -- about the record that's available
6    online, you used that; correct?
7        A.  Yes.
8        Q.  Okay.  What determines whether or not
9    Sterling fulfills a background check request, either
10   in an automated way by the computer or by somebody
11   actually going out there?
12           MR. O'NEIL:  Objection.  Lack of
13   foundation.
14       Q.  You can answer.
15       A.  It really depends on the jurisdiction.
16   Is -- is it even available to do online or through
17   an integration, some are not.  It could be
18   jurisdiction that even if it is available, we have
19   such a small volume that it's not worth the expense
20   to integrate.  Those are -- pretty much figure it
21   out, those would be the circumstances.
22       Q.  Okay.  Are you able to know whether or not
23   the information that Sterling returned to -- to SBM
24   about this misdemeanor record we're looking at was
25   the full and complete court record pertaining to

13  (Pages 49 to 52)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

---

Page 53

1    this record?
2        A.  That, I don't know.
3        Q.  Okay.  Other than obtaining the actual --
4    going to the -- the actual court, do you know how
5    you would find that out?
6        A.  No.
7        Q.  Okay.  Would somebody like Mr. Rambarron
8    be familiar with the information that was returned
9    on -- on a record like this?
10       A.  What do you mean "the information"?
11       Q.  In other words, whether or not it was a
12   summary information or whether it was the entire
13   file or whether it was the complete record.  Who
14   would know the answer to that?
15       A.  Glen -- Mr. Rambarron would know what
16   comes back from the particular jurisdiction.
17       Q.  Okay.  He would.
18       A.  If he didn't know it off the top of his
19   head, he would have access to it.
20       Q.  Okay.  And just to add a little more teeth
21   to this, where -- where did the information which
22   appears on page 1 of Plaintiff's Exhibit Number 1,
23   where did this come from?
24       MR. O'NEIL:  Objection.  Asked and
25   answered.  He already explained to you he

---

Page 54

1    doesn't know.
2        Q.  No, you -- you can answer.
3        A.  Are you saying -- Providence, Rhode
4    Island --
5        Q.  Yes.
6        A.  -- are you asking?
7        Q.  Yeah.  Yeah.
8        A.  Yes.  It came from -- the jurisdiction is
9    Providence, Rhode Island.
10       Q.  Okay.  So a court in Providence, Rhode
11   Island; correct?
12       A.  Correct.
13       Q.  All right.
14       A.  A court or whatever source that we
15   actually use for Providence, Rhode Island.
16       Q.  I see.
17       And would I be correct in stating that for
18   each jurisdiction, such as Providence, Rhode Island,
19   the company has a standard method of retrieving
20   information from that jurisdiction?
21       A.  Yes.
22       Q.  Okay.  And so, in connection with the
23   report about Mr. Sanchez, the information that
24   was obtained from the Providence, Rhode Island
25   source, this is typical of the information that

---

Page 55

1    Sterling would return in connection with any
2    request?
3        MR. O'NEIL:  Objection.  Vague.
4        Q.  You can answer.
5        A.  Typically, yes.
6        Q.  Okay.
7        A.  Aside from the date of birth that was
8    mentioned earlier.
9        Q.  Okay.  You don't know anything, you know,
10   which would lead you to believe that Sterling
11   followed a different process from its usual process
12   in connection with fulfilling this request from SBM;
13   right?
14       A.  No.
15       Q.  All right.  Okay.  And would you turn your
16   attention to the second page, please.
17       Am I correct that on this page this shows
18   that Sterling returned a second criminal record to
19   SBM concerning Mr. Sanchez?
20       A.  Correct.
21       Q.  All right.  And this second record was a
22   possession of a controlled substance; correct?
23       A.  Correct.
24       Q.  All right.  And was this also from the
25   Providence, Rhode Island source?

---

Page 56

1        A.  Yes.
2        Q.  Anything atypical about Sterling's
3    reporting this record back to SBM?
4        A.  Aside from just the date of birth, no.
5        Q.  Okay.  Are there -- when you look at the
6    date of birth, are you talking about where the
7    asterisks appear?
8        A.  Correct.
9        Q.  Okay.  And does that happen sometimes, the
10   date of birth -- the full date of birth doesn't come
11   back from the source?
12       A.  Yes.
13       Q.  It does?
14       A.  Yes.
15       Q.  Okay.  So that's not that unusual; right?
16       A.  No.
17       Q.  Okay.  And am I correct that, as
18   demonstrated on page 2 of Plaintiff's Exhibit Number
19   1, Sterling actually returned a third criminal
20   record regarding Mr. Sanchez to SBM?
21       A.  Correct.
22       Q.  All right.  And that record is the --
23   relates to a -- an apparent charge of possession of
24   marijuana and obstructing a police officer; correct?
25       A.  Correct.

---

14 (Pages 53 to 56)

Sanchez v. Sterling Infosystems, Inc., et al.

ADAM NAGER, 3/21/13

---

Page 57

1    Q.  Okay.  And was that -- was this
2  information obtained from the same source as the
3  other two?
4    A.  It appears to be, yes, Providence, Rhode
5  Island.
6    Q.  Okay.  Any reason to believe that
7  Sterling's standard procedure and process for
8  fulfilling a background check wasn't followed in
9  this case?
10   A.  No.
11   Q.  All right.  Is the - is the format of the
12 information and the appearance of it consistent with
13 Sterling's other reports?
14   A.  Yes.
15   Q.  All right.  All right.  Would you turn
16 your attention to page 3 of -- of Plaintiff's
17 Exhibit Number 1, please.
18       And would I be correct in stating that
19 Sterling, also, in addition to looking for the three
20 records we've gone over already, also queried the
21 nationwide database?
22   A.  Correct.
23   Q.  All right.  It didn't find anything there,
24 though; right?
25   A.  Correct.

---

Page 58

1    Q.  All right.  Do you know whether or not the
2  database that was queried in connection with the
3  Sanchez report was the Acxiom or Experian database?
4    A.  This would have been Acxiom.
5    Q.  Okay.  Would you turn your attention to
6  page 4, please.
7        What information is generally contained
8  here -- well, strike that.
9        Here's -- this, page 4 of Plaintiff's
10 Exhibit Number 1, has a heading "SS Trace Results."
11 Do you see that?
12   A.  Correct.
13   Q.  Putting aside anything pertaining to Mr.
14 Sanchez, what information is generally contained on
15 a page like this?
16   A.  Typically, it will -- has -- has the
17 applicant's name, any name variations.  Often we'll
18 have maiden name.  It will have their social
19 security number, which it mathematically will figure
20 out if it was valid.  If it was reported deceased,
21 the social security number would say that as well.
22 The date issued -- well, the approximate date
23 issued.  Then it also lists out the address history
24 for the applicant.
25   Q.  Okay.  Is there anything unusual about the

---

Page 59

1  information that was obtained by Sterling and
2  provided to SBM in connection with this section of
3  the report?
4    A.  No.
5    Q.  Turn -- if you would turn to the next
6  page, please.  Can you identify this part of
7  Plaintiff's Exhibit Number 1?
8    A.  This is a -- the report for Jose Sanchez.
9    Q.  Okay.  Different report than the first
10 thing we were going over?
11   A.  It's the same report number.
12   Q.  Okay.
13   A.  And it looks to have been amended.
14   Q.  All right.  Do you know how this would
15 have -- this document would have come about?
16   A.  Typically, an applicant would have filed a
17 dispute, and then we'd reissue the report to the
18 employer and send a copy to the applicant.
19   Q.  Do you know if -- if the applicant in this
20 case, Mr. Sanchez, initiated a dispute?
21   A.  That, I don't know.
22   Q.  Okay.  Do you know how this report came
23 about or came to be generated?
24   A.  Somebody initiated a dispute, and we would
25 have amended it.

---

Page 60

1    Q.  Okay.  Are you able to determine from
2  looking at this document when that dispute would
3  have been investigated?
4    A.  No.
5    Q.  Okay.  Underneath the result status,
6  there -- there is a heading "finding."  Do you see
7  that?
8    A.  Correct.
9    Q.  And then there -- here it reads, "clear."
10 Do you see that?
11   A.  Correct.
12   Q.  And what does that mean in -- in Sterling
13 parlance?
14   A.  No criminal records were found.
15   Q.  Do you know what, if anything, Sterling
16 did to determine, in connection with this report,
17 that DEF-5, that there were no criminal records
18 which pertain to Mr. Sanchez?
19   A.  To this particular report, I can't say
20 exactly what was done.  I can say what we would
21 typically do to investigate.
22   Q.  Okay.  What would you typically do?
23   A.  Contact the court, see if we can get more
24 information on the record, try and confirm something
25 else on the report.  It could be driver's license

---

15  (Pages 57 to 60)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 61

1  number that they might have on file. It could be
2  part of a social.
3      Q.  In this case, do you know why Sterling
4  found the criminal result to be clear?
5      A.  We must have reinvestigated it and
6  confirmed something else that it wasn't him.
7      Q.  Okay. Do you know what that data was that
8  it was confirmed?
9      A.  No.
10     Q.  Do you know who was involved in doing
11 that?
12     A.  Not off the top of my head.
13     Q.  Okay. Would -- would Sterling's record --
14 strike.
15         Does Sterling maintain records regarding
16 consumer disputes and/or any action taken by the
17 company in response to a consumer dispute?
18     A.  Yes.
19     Q.  And would that record reveal the names of
20 any Sterling employees who would have taken any
21 action with regard to this dispute?
22     A.  Today, yes.
23     Q.  How about at -- at this time?
24     A.  Possibly, the record keeping may not have
25 been as good at that time.

Page 62

1      Q.  Why not? What changed?
2      A.  Just not everything was logged in
3  Salesforce properly, and we just redefined the
4  procedure to put more details.
5      Q.  Okay. Is Salesforce the database which
6  documents consumer disputes and/or the company's
7  responses to those disputes?
8      A.  Yes.
9      Q.  In some of the Salesforce records which
10 were produced in this case, there are several names
11 which appear. One is the name of a Kendra Mangum.
12 Do you know who that is?
13     A.  Yes.
14     Q.  Who is that?
15     A.  She works out of our New York office.
16     Q.  Okay. Do you actually know who that
17 person is?
18     A.  Yes.
19     Q.  What's her position at the company?
20     A.  Now, I'm not sure.
21     Q.  How about in the past?
22     A.  She used to be a sort of special
23 operations role and would assist in consumer
24 disputes.
25     Q.  Okay.

Page 63

1      A.  I think she's now in vendor management,
2  but I'm not positive.
3      Q.  Okay. And another name that I've seen is
4  a Gianie Kim. Does that name ring a bell to you?
5      A.  Yes.
6      Q.  Who is Gianie Kim?
7      A.  She works in our client services
8  department.
9      Q.  How long have you known Miss Kim?
10     A.  Two years maybe. I'm just guessing. I
11 don't -- I'm not quite -- since she's been with the
12 company, but I'm not quite sure how long that's
13 been.
14     Q.  Have you had any discussions with Miss Kim
15 about your testimony today or her coming to appear
16 here later on today?
17     A.  No.
18     Q.  Have you had any discussions with her
19 about this case?
20     A.  We may have talked about the report when
21 initially investigating what happened.
22     Q.  Do you have a memory or recollection of
23 that?
24     A.  Not really. If this was her client, we
25 probably would have asked her though.

Page 64

1      Q.  You mean SBM?
2      A.  Correct, yes.
3          MR. FRANCIS:  Off the video. Can we take
4  a five-minute break?
5          MR. O'NEIL:  Sure.
6          THE VIDEOGRAPHER:  11:16. Off the record.
7
8          (A recess was taken.)
9
10         THE VIDEOGRAPHER:  It's 11:27 a.m. on the
11 record. Beginning of DVD 2.
12
13 BY MR. FRANCIS:
14     Q.  Okay. Mr. Nager, just a couple of more --
15 one or two more questions regarding the Sanchez
16 background report. I've asked you some of these
17 questions already. I just want to be clear. Is
18 there anything about SBM's request for a background
19 check about Mr. Sanchez which was unusual or out of
20 the ordinary?
21         MR. O'NEIL:  Objection. Assumes facts not
22 in evidence. Lack of foundation.
23     Q.  You could answer.
24     A.  Not that I can tell from the background
25 check.

16 (Pages 61 to 64)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 65

1     Q.  Okay.  Was there anything unusual or
2  atypical about the fact that Sterling fulfilled that
3  request?
4     A.  No.
5     Q.  Okay.  Is that what it would typically do
6  with a client?
7     A.  Fulfill the request, yes.
8     Q.  Yes.
9        Okay.  Is there anything about Sterling
10 providing SBM the background check on Mr. Sanchez,
11 which I've asked you about, which was unusual or
12 atypical of its usual process that it follows?
13    A.  Not that I can see from the background
14 check.
15    MR. FRANCIS:  Okay.  What I'd like to do
16 now is turn your attention to Plaintiff's
17 Exhibit Number 2.
18
19       (Plaintiff's Exhibit 2,
20       DOCUMENT BATES NOS. DEF00084 -
21       DEF00087, was marked for identification.)
22
23    Q.  I'm handing you Plaintiff's Exhibit Number
24 2.  It's actually a series of documents which bear
25 the numbers DEF-84 through 87.

Page 66

1        Do you have those in front of you?
2     A.  Yes.
3     Q.  Okay.  Turning to the first page,
4  Defendant's 84, do you recognize this e-mail?
5     A.  Yes.
6     Q.  Okay.  What -- what is this?
7     A.  Earlier this year, or actually late last
8  year, the new Summary of Rights, Notice to Users of
9  Consumer Reports and Notice to Furnishers was issued
10 by the FT -- Consumer Financial Protection Bureau.
11    Q.  Okay.
12    A.  And we sent out an e-mail through
13 Salesforce to all of our client-facing people.
14    Q.  Okay.  So if we look at DEF-84, there are
15 ton of names on here; right?
16    A.  Correct
17    Q.  Who are these people, or why -- why did
18 they get this particular memo?
19    A.  The majority of them are in client-facing,
20 meaning --
21    Q.  What does that mean, "client-facing"?
22    A.  -- they -- they interface with our
23 clients.  It could be client services; it could be
24 account management.  You also have people who are in
25 our implementations team, which start new clients.

Page 67

1     Q.  Okay.
2     A.  Salespeople.
3     Q.  Okay.  There are several names on here I
4  want to ask you about.  First of all, who is Bobbie
5  Sauvain?
6     A.  She works out of our California office.
7  She's the one who initiates these Salesforce-driven
8  e-mails.
9     Q.  Okay.  What's her position?
10    A.  She's in operations, but she also -- I
11 think -- I don't know her title.
12    Q.  All right.  And there is a Vimal Kotak at
13 the bottom.
14    A.  Correct.
15    Q.  Do you see that?
16    A.  Yes.
17    Q.  Do you know who that person is?
18    A.  He's in our criminal department or
19 operations department out of Mumbai.
20    Q.  Okay.  Do you know him?
21    A.  I know him, yes.
22    Q.  Have you met him?
23    A.  I don't know if I've met him face-to-face.
24 I don't know if he's ever been to the states.
25    Q.  Okay.  And -- and you said he's in the

Page 68

1  criminal records department.  What does he do for
2  the company?
3     A.  Well, operations department.
4     Q.  Okay.  What does he do for the company?
5     A.  He's a supervisor in operations.  I
6  typically -- if I need information about a criminal
7  record, I'll put him on it, along with the criminal
8  department.
9     Q.  What do you mean "information about a
10 criminal record," like what type of information?
11    A.  What does this mean?  What does this
12 deposition mean?  How do we fulfill a search in this
13 jurisdiction?
14    Q.  Okay.  And then if you turn to the second
15 page of Plaintiff's Exhibit Number 2, it reads,
16 "Dear Colleagues"; right?  And then underneath that,
17 if -- if you go to the next page, it directs the
18 readers if they have any questions to contact you;
19 correct?
20    A.  Correct.
21    Q.  And is that because that's -- this is the
22 type of thing that you do at Sterling?
23    A.  Well, if they had any questions on why
24 these forms were changed or what they needed to do
25 with them, they would contact me.

17  (Pages 65 to 68)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 69

1   Q.  All right.  And if you turn to DEF-87, can
2   you tell me what this e-mail pertains to.
3   A.  This is an announcement regarding
4   California and the use of credit reports.
5   Q.  All right.  And is this something that you
6   do in connection with your position as compliance
7   manager at the company?
8   A.  Now what I would do is draw this up, work
9   with Joe Rotondo, and then send it to Bobbie.  And
10  it would go out in the fashion of the previous
11  announcement.  Prior to that, we would send it out
12  just through a regular e-mail.
13  Q.  Okay.  And the information here that
14  you -- that you are communicating is information
15  that was provided to you by Jackson Lewis; correct?
16  A.  Most likely, yes.  They usually would help
17  us summarize with the bills.
18          MR. FRANCIS:  Okay.  Mark that as
19  Plaintiff's Exhibit 3, please.
20
21          (Plaintiff's Exhibit 3,
22          CONSENT AND DISCLOSURE,
23          BATES STAMP NO. DEF00089,
24          was marked for identification.)
25

Page 70

1           MR. O'NEIL:  Mr. Mailman, do you have any
2   objection to me stapling together the loose
3   four pages that make up the exhibit?
4           MR. FRANCIS:  No, but I have a big
5   objection to you calling me Mr. Mailman.
6           MR. O'NEIL:  I'm sorry.
7           MR. FRANCIS:  Because if you met him you'd
8   understand why.  No, I'm just kidding.  He's a
9   good guy, but -- not at all.
10  Q.  Okay.  So, Mr. Nager, I've just handed you
11  a document which was produced in this litigation.
12  It's been marked as Plaintiff's Exhibit Number 3,
13  and it has the -- stamp at the bottom, DEF-89.
14      Do you see that?
15  A.  Yes.
16  Q.  Okay.  Can you identify this document for
17  me?
18  A.  This is an old version of our consent and
19  disclosure form.
20  Q.  Okay.
21          THE VIDEOGRAPHER:  Excuse me.  Does
22  someone have a BlackBerry on?  Okay.  It's good
23  now.  You did something.  I don't know.  It's
24  good now.  It's fine.
25  Q.  All right.  Is this the consent form that

Page 71

1   you discussed earlier?
2           MR. O'NEIL:  Objection.  Vague.
3   Q.  I'm sorry.  When we were -- when I was
4   asking you about the forms and the consent forms, is
5   this an example of one of those forms?
6   A.  Yes.
7   Q.  Okay.  This is the -- this is a form that
8   Sterling created which it provided to its clients
9   for them to use in obtaining a job applicant's
10  consent for a background check; correct?
11  A.  Correct.
12  Q.  All right.  And you say this was an old
13  version?
14  A.  Yes.
15  Q.  Okay.  How do you know that?
16  A.  One, the date on the bottom, says
17  10/5/2006, which may or may not be accurate.  Also,
18  you have the logo, that's our old logo.  Also, when
19  I first started going into the compliance
20  department, we had already moved on to the two-page
21  form.
22  Q.  Okay.
23          THE VIDEOGRAPHER:  I'm getting that -- can
24  you --
25          MR. FRANCIS:  Okay.

Page 72

1           THE VIDEOGRAPHER:  Maybe it's me.
2   Q.  Okay.  So you're able to identify this as
3   a form that was in use at some point in the past,
4   but not currently; correct?
5   A.  Correct.
6   Q.  All right.  And --
7   A.  Well, let me --
8   Q.  Go ahead.
9   A.  -- clarify that.  It's not currently given
10  out to clients.  We don't know if any clients are
11  still using it.
12  Q.  I see.  Okay.  Let me ask you generally
13  about these forms, because there are other ones that
14  have been provided that I'm going to ask you about
15  as well.  Okay?
16  A.  Okay.
17  Q.  The various versions of these -- these
18  forms.  When this -- let's start with this form.
19      Okay.  When this form was created by
20  Sterling, would I be correct that it was provided to
21  Sterling's clients at that time?
22  A.  Yes.
23  Q.  Okay.  How would it be given to Sterling's
24  clients?
25          MR. O'NEIL:  Objection.  Lack of

18  (Pages 69 to 72)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 73

1      foundation. He wasn't in that role in 2006,
2      but --
3          Q.  You can answer.
4          A.  Typically, by e-mail.
5          Q.  Okay. Typically, by e-mail the Sterling
6      would give this to its clients; correct?
7          A.  Correct.
8          Q.  All right. And when -- are you familiar
9      with the general on-boarding process when a new
10     client is brought on board?
11         A.  Generally, yes.
12         Q.  Okay. And does the client -- does a --
13     does a new client have the ability to use its own
14     form or select Sterling to -- to provide the forms?
15         A.  With a paper form, they can use their own
16     form. With electronic forms, it's -- they don't
17     have that flexibility.
18         Q.  Okay. What was this one, right here,
19     that's Plaintiff's Exhibit --
20         A.  This would be paper form.
21         Q.  Okay. But this would have been given to
22     your clients at some point in time; right?
23         A.  Correct.
24         Q.  Okay. And when you say it would have been
25     given by e-mail, would it have been given at the

Page 74

1      time the client is on-boarded, or it would have been
2      e-mailed separate and apart from that?
3          A.  It could have been during the sales
4      process. It could have been during the
5      implementation process. Some clients want to see it
6      before they even get on-boarded.
7          Q.  Okay. And when a client was on-boarded,
8      would I be correct that Sterling would give the
9      client the form that was -- it was using at the
10     time?
11         A.  Yes.
12         Q.  Okay. Do you know -- you pointed to the
13     date at the bottom of this form, 10/5/2006. Do you
14     see that?
15         A.  Correct.
16         Q.  All right. What does that date mean?
17         A.  Not too much, in my opinion. They weren't
18     kept consistently. They weren't updated properly.
19         Q.  Okay. What -- who would have put that
20     date there?
21         A.  This form, probably somebody by the name
22     of Eamon Cunningham.
23         Q.  Okay. Who is that person?
24         A.  He was in -- a compliance researcher prior
25     to me starting with Joe Rotondo.

Page 75

1          Q.  What were you doing in 2006 in terms -- at
2      the company?
3          A.  Either I had just started with Joe Rotondo
4      or I was running the -- a mortgage credit reporting
5      agency that was run by -- by Sterling.
6          Q.  Okay. You said -- could you spell -- the
7      other -- the guy's name, Eamon Cunningham?
8          A.  Correct.
9          Q.  How do you spell the first name?
10         A.  E-A-M-O-N.
11         Q.  Okay. Was he the predecessor of you?
12         A.  Correct.
13         Q.  All right. And would he have been the one
14     who drafted the language here which is in
15     Plaintiff's Exhibit Number 3?
16         MR. O'NEIL:  Objection. Lack of
17     foundation.
18         Q.  You can answer.
19         A.  Most likely, that would probably have been
20     Jackson Lewis. He wouldn't have drafted the
21     language.
22         Q.  Okay. Why would he have put the -- the
23     date on it, though?
24         A.  If there -- if the form required
25     manipulation in Word, then he would, most likely,

Page 76

1      have done it for Joe.
2          Q.  Okay. Have you ever taken a form like
3      this and added the date on the bottom?
4          A.  On the new versions?
5          Q.  Yes.
6          A.  Yes.
7          Q.  Okay. You've done that on different --
8          A.  I've updated versions and added --
9      corrected dates.
10         Q.  Okay.
11         A.  But never a one-page form.
12         Q.  Okay. A one-page form was in use prior to
13     your joining; correct?
14         A.  Correct. There was an initiative to
15     switch everybody to -- over to the two-page form
16     when I joined Joe Rotondo.
17         Q.  Okay. And when that initiative occurred,
18     were the clients all sent a new form?
19         A.  Yes.
20         Q.  Okay. Whenever -- if -- if a consent form
21     was changed at any point, would that be
22     distributed -- the new form be distributed to
23     Sterling's clients?
24         A.  Hopefully, it would be distributed
25     internally, and I don't think we were blasting

19 (Pages 73 to 76)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 77

1   e-mails at the time for new -- for new forms. It
2   would go out, again, to account management and
3   client services, and it would be their
4   responsibility to -- to distribute it to their
5   clients.
6       Q.  Okay.  Do you know whether or not, in
7   fact, revisions to the consent form that are
8   Plaintiff's Exhibit Number 3 were provided to
9   Sterling's clients?
10      MR. O'NEIL:  Objection.  Lack of
11  foundation.
12      Q.  You can answer.
13      A.  I can't -- I can't say definitely if all
14  revisions were given out to clients.
15      Q.  Okay.  Do you know whether any of them
16  were?
17      A.  The ones that I've sent out, I gave to
18  client facing, but, again, I can't say that they
19  were given directly to clients.
20      Q.  Okay.  When -- when did you make changes
21  to the forms or distribute changes to the consent
22  form?
23      A.  When in terms of --
24      Q.  When have you done it?  Is it within the
25  last year, five -- three years ago or --

Page 78

1       A.  The last year we've made a couple of
2   different revisions.  The most common one now is
3   every time a new state passes a credit law that -- a
4   credit restriction law that has a notification
5   requirement, we'll incorporate the language in --
6   onto our consent form.
7       Q.  Okay.  If you look at DEF-89 or
8   Plaintiff's Exhibit Number 3, and you look one, two,
9   three, four -- the fifth full paragraph down.  Okay.
10  It's -- it begins, "I also understand."
11      A.  Okay.
12      Q.  I'm sorry.  No.  Go to the sixth
13  paragraph.  Okay.  It begins, "In exchange for,"
14  bracket, "Company's name."  Do you see that?
15      A.  Yes.
16      Q.  That paragraph does not appear in some of
17  the subsequent changes to the forms.  Do you know
18  why that paragraph was taken out?
19      A.  It takes away from the stand-alone
20  requirement.
21      Q.  Do you know what the circumstances
22  are which caused that paragraph to be removed from
23  subsequent versions of this form?
24      MR. O'NEIL:  I would caution the witness
25  not to disclose any attorney/client

Page 79

1   communications in responding response to the
2   question.
3       A.  I don't know if it was in relation to a
4   lawsuit that we had seen from a competitor, or if it
5   was a decision from Joe Rotondo and Jackson Lewis,
6   of discussion that they had, but I know we removed
7   it.
8       Q.  Okay.  Do you have a recollection of that
9   change occurring?
10      A.  Some conversations about it, but, no.
11      Q.  Just general conversations --
12      A.  Yeah.
13      Q.  -- right?  But you do remember at some
14  point that paragraph was there, and then at some
15  point the company removed it; correct?
16      A.  Correct.
17      Q.  All right.  And did you have any role or
18  involvement in -- in causing that?
19      A.  I probably was the one who made the
20  changes to the documents, but the discussions at
21  that time would have taken place above me.
22      Q.  Okay.  So in connection with your job at
23  the company, one of the things that you would do is
24  you would actually make the -- the physical changes
25  to one of these consent forms?

Page 80

1       A.  Correct.
2       Q.  All right.  So today, for example, if the
3   company decided, Hey, we got to change our consent
4   forms today because of X, Y, and Z state passed a
5   new law, you would be the one who would go into the
6   computer and make that language change; right?
7       A.  Correct.
8       Q.  Correct?
9       A.  Yes.
10      Q.  Okay.  How long have you been in that
11  role?
12      A.  That I've been doing probably since 2006,
13  2007.
14      Q.  Okay.  So given the fact that this was in
15  2006, would you have made the deletion to this
16  paragraph?
17      A.  Not on -- again, not on this form, because
18  it's a one-page.  On a two-page, possibly.
19      Q.  Okay.
20      MR. FRANCIS:  Plaintiff's Exhibit Number
21  4.
22
23      (Plaintiff's Exhibit 4,
24      CONSENT & DISCLOSURE FORM,
25      BATES STAMP NO. DEF00096,

20  (Pages 77 to 80)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 81

1        was marked for identification.)
2
3        Q.  Plaintiff's Exhibit Number 4, I'm handing
4    to you right now.  Can you identify this document?
5        A.  This is another one -- another form of our
6    consent and disclosure.
7        Q.  Okay.  At the -- right.  This is one that
8    apparently was in use in -- in 2008?
9        A.  Correct.
10       Q.  Okay.  And I'm looking at the bottom,
11   there is a USXXCDEN-V03.  Do you see that?
12       A.  Yes.
13       Q.  What does that code mean?
14       A.  Absolutely nothing.  It used to be part of
15   a initiative to try and label every document at the
16   company and was just abandoned.
17       Q.  When was it abandoned?
18       A.  I don't know when it really even started.
19   It never took off.
20       Q.  Okay.  So at some point, every document
21   that the company used was -- was branded with some
22   type of unique identifier; correct?
23       A.  Correct.
24       Q.  That way it could be searched and found;
25   right?

Page 82

1        A.  Exactly.
2        Q.  Okay.  And so would I be correct in saying
3    that that little -- that code that I just read, that
4    was unique to this consent and disclosure form?
5        A.  Possibly.  There's no way to really know
6    if that was updated properly, if it may have been
7    just carried over and not updated.
8        Q.  Okay.  So this is the consent and
9    disclosure form that the company was using in
10   February of 2008; correct?
11       A.  According to the date, yes.
12       Q.  Okay.  Or put in a different way, on --
13   somebody at the company coded this form or updated
14   this form on February 12th, 2008; correct?
15       A.  Correct.
16       Q.  All right.  Now, this would have been the
17   form that Sterling would have distributed to its
18   clients in or around that time period; correct?
19       A.  Yes.
20       Q.  All right.  Now, with regard to these
21   consent and disclosure forms and the way they've
22   changed over time, are they available on a Web site
23   somewhere for a client to see them?
24       A.  The old versions?
25       Q.  Yes.

Page 83

1        A.  They're not available to clients anymore.
2        Q.  Okay.
3        A.  Only our most recent version is typically
4    available to clients.
5        Q.  Okay.  So if Sterling made a change to the
6    consent form, it would then do away or remove the
7    previous versions from the Web site; correct?
8        A.  Correct.
9        Q.  All right.  And, again, do you know
10   whether or not the -- any change to the forms would
11   be communicated to clients by way of sending the new
12   form to clients?
13       A.  Again, it would be sent out to client
14   facing, and it would be their responsibility to
15   inform clients.
16       Q.  Okay.  Do you know why this form was
17   updated in February of 2008?
18       A.  No.
19       Q.  Okay.  Would I be correct in stating that
20   based upon the appearance of this form that, at
21   least, as of February 2008, Sterling was still
22   including the "in exchange for" language I asked you
23   about earlier on the consent and disclosure form
24   that it would send to its clients?
25       A.  On this form, yes.

Page 84

1        Q.  Okay.  And do you know what prompted the
2    change to the form in February of 2008?
3        A.  No.
4        Q.  If -- strike that.
5            When the company changed its consent and
6    disclosure forms, would that -- would the reason for
7    that be memorialized somewhere in a record?
8        A.  No.
9        Q.  No.
10           MR. FRANCIS:  Mark this as Plaintiff's
11       Exhibit 5, please.
12
13           (Plaintiff's Exhibit 5,
14           CONSENT TO REQUEST CONSUMER REPORT
15           BATES STAMP NO. DFF00100, was
16           marked for identification.)
17
18       Q.  I'm handing you Plaintiff's Exhibit Number
19   5.  This is another version of the -- of Sterling's
20   consent form that it had provided to its clients;
21   correct?
22       A.  Correct.
23       Q.  Are you able to tell when this form --
24   when the consent form would have been changed here?
25       A.  It says December of 2008.

21  (Pages 81 to 84)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 85

1    Q.  Okay.  Do you know who it was that
2  actually changed the form in December of 2008?
3    A.  It probably would have been me.
4    Q.  Okay.  And there's that identifier at the
5  bottom; right?  It's a little bit different than the
6  last one.  It's USCACDEN-V02.  Do you see that?
7    A.  Correct.
8    Q.  Okay.  Do you know when you stopped using
9  the unique identifier?
10    A.  No.  I don't think it was actually ever
11  used by my department, or at least it was never used
12  by me.
13    Q.  Did you -- did you write that in there
14  or --
15    A.  No.  I probably just left it on a form.
16    Q.  Okay.  Do you know whether or not you were
17  the one that changed the form in December 2008, or
18  are you -- are you guessing?
19    A.  Most likely it would have been me.
20    Q.  Okay.  And would you agree with me that in
21  this version of the consent form, it does -- it no
22  longer has that "in exchange" language?
23    A.  Correct.
24    Q.  Okay.  And -- and, again, you don't know
25  why you removed that in December 2008?

Page 86

1    A.  It was probably either from a lawsuit that
2  we had seen or on advise of counsel.
3    Q.  Okay.  There is a paragraph in here
4  which -- one, two -- it's like the -- the third full
5  paragraph or the fourth full paragraph.  It begins,
6  "This consent."  Do you see that?
7    A.  Correct.
8    Q.  Do you know who drafted the language in
9  this paragraph?
10    A.  Most likely that would have been Jackson
11  Lewis.
12    Q.  Okay.  There is a statement here which
13  reads in this paragraph that, "If I disagree with
14  the accuracy of the purported disqualifying
15  information in the report, I must notify company
16  within five business days of my receipt of the
17  report that I am challenging the accuracy of such
18  information with Sterling Infosystems, Inc.,"
19  period.
20        Do you see that?
21    A.  Yes.
22    Q.  Is that language that was provided by
23  Jackson Lewis?
24    A.  Most likely.
25    Q.  Do you know of any requirement in the Fair

Page 87

1  Credit Reporting Act, or otherwise, which requires a
2  consumer to make a dispute within five business days
3  of something?
4    A.  No.
5    Q.  Okay.  Do you know why that language is
6  included in there?
7    A.  Probably best practice from Jackson Lewis.
8    Q.  When you say "best" -- what do you mean
9  "best practice"?
10    A.  Usually, we say to give the applicant five
11  days to dispute the information.
12    Q.  Okay.  But do you know of any law which
13  requires the -- that information to be included --
14    A.  No.
15    Q.  -- within this form?
16        MR. O'NEIL:  I would instruct the witness
17  not to include in his answer any information
18  that he received from Jackson Lewis or other
19  lawyers.
20    A.  No.  I believe that was from an FTC
21  opinion letter with the five days.
22    Q.  Okay.  Is it your testimony that you --
23  you -- you think that there's an FTC opinion letter
24  which states that this information should be
25  included in a consent form?

Page 88

1    A.  No.
2    Q.  What are you saying?
3        MR. O'NEIL:  Again, I would caution the
4  witness to exclude from his answer any
5  information he received from privileged
6  communications.
7        MR. FRANCIS:  I understand.
8    Q.  For you as a compliance person, not in
9  connection with the lawyers.
10    A.  Understood.
11        MR. O'NEIL:  Well, I know you understand.
12  I just want to make the witness understands.
13        MR. FRANCIS:  Right.  I understand.
14    Q.  Go ahead.
15    A.  The -- not to include it into the consent
16  form, but to allow time for a dispute.
17    Q.  In general?
18    A.  In general.
19    Q.  Right?  But not in connection with the --
20  with a consent form; correct?
21    A.  Correct.
22    Q.  Okay.  Do you know whether the company
23  continues to use that language in the consent form
24  today?
25    A.  I believe it is.  I'd have to check a

22 (Pages 85 to 88)

Sanchez v. Sterling Infosystems, Inc., et al.                          ADAM NAGER, 3/21/13

Page 89

1   current version.
2       Q.  And is it your -- do you think that that
3   complies with the stand-alone requirement you
4   mentioned before?
5       A.  I think so.
6       Q.  Okay.  And by the "stand-alone
7   requirement," do you know what -- do you know what I
8   mean?
9       A.  Yes.
10      Q.  Okay.  Would you agree with me that there
11  is no requirement that a consumer must make a
12  dispute of an -- of an inaccuracy in a background
13  check within five days of -- of receiving a copy of
14  the report?
15          MR. O'NEIL:  Objection.  It calls for a
16  legal conclusion.
17      Q.  You can answer.
18      A.  I agree.
19      Q.  Okay.  And you would agree with me, would
20  you not, that if a consumer made a dispute to
21  Sterling at any time in connection with a background
22  check that it had run, Sterling is under -- has a
23  legal obligation to investigate that dispute?
24      A.  Correct.
25      Q.  In this --

Page 90

1           THE WITNESS:  Can we take a second?
2           MR. FRANCIS:  Sure.
3           MR. O'NEIL:  Yeah.  Let's take a break.
4           MR. FRANCIS:  Sure.
5           THE WITNESS:  I have a quick question for
6   you.
7           THE VIDEOGRAPHER:  11:58.  Off the record.
8
9           (A recess was taken.)
10
11          MR. FRANCIS:  Can you mark this as
12  Plaintiff's Exhibit Number 6, please.
13
14          (Plaintiff's Exhibit 6,
15          CONSENT TO REQUEST CONSUMER REPORT,
16          BATES STAMP NO. DEF000858, was
17          marked for identification.)
18
19          THE VIDEOGRAPHER:  It's 12 p.m.  On the
20  record.
21
22  BY MR. FRANCIS:
23      Q.  Mr. Nager, I was trying to go in order,
24  but my co-counselor reminded me that I'd skipped one
25  of the forms, so we're going to go back for a

Page 91

1   second.
2           I'm handing you Plaintiff's Exhibit 6.
3   Can you identify this form?
4       A.  This is another version of our consent and
5   disclosure.
6       Q.  Okay.  Now, am I correct that this one
7   would have been in use in or around July of 2008?
8       A.  This looks like -- it's not a standard
9   one, and it says July of 2008, but it's not a
10  standard consent and disclosure form.
11      Q.  Okay.  Would you have been the one -- the
12  person who would have notated the "July of 2008" on
13  this form?
14      A.  Possibly.  This may -- this may have been
15  done by somebody else.  It looks like it's part of
16  our student module.
17      Q.  What's a student module?
18      A.  For -- we have an electronic signature
19  module, and we developed one with language that's
20  particular to students.
21      Q.  Okay.  How -- how can you tell that this
22  student based?
23      A.  Okay.  So you have, "I understand that,"
24  you enter the organization's name.  "Hereto known as
25  organization."

Page 92

1           And then if you go on, "Get a consumer
2   investigative consumer part" -- "report as part of
3   the procedure for processing my application for
4   enrollment to an academic institution."  So that
5   looks like it's from a student.  Other different
6   language:  "I acknowledge that I have downloaded and
7   read the summary of my rights under the Fair Credit
8   Reporting Act."  So it would be on that module.  And
9   another thing with the student module is the same
10  thing with the electronic signature module, is that
11  some of the language is not here.  So this is only
12  one of them in the paper form.
13      Q.  Okay.  So this was basically the consent
14  form adapted for students?
15      A.  Yes.
16      Q.  Okay.  And would you agree with me that,
17  at least as of July of 2008, the company was still
18  using the "in exchange for" language, which I asked
19  you about earlier and which you said was removed at
20  some point, at least in its consent and disclosure
21  forms as of July of 2008?
22      A.  According to this form, yes.
23      Q.  Okay.  And would I be correct with regard
24  to all of the consent forms that we've seen so far,
25  that the forms were used for all employers, right,

                                          23 (Pages 89 to 92)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

---

Page 93

1  not just a handful of them; right?
2      A.  Well, this one wasn't --
3          MR. O'NEIL:  Objection.  Vague.
4      Q.  You can answer.
5      A.  This one wasn't used for employers.
6      Q.  Okay.  Well, put -- how about the other
7  ones, the ones we've looked at?
8      A.  Yes.
9      Q.  Right.  So just to the clear, the -- the
10  standard forms that we looked at in Plaintiff's
11  Exhibit 4 and 5, for example, those would have been
12  given to all employers at the time; correct?
13      A.  Yes.
14      Q.  And Sterling -- when Sterling made a
15  change to its consent and disclosure form, it made
16  that change to all of the forms that it would use
17  for all of its clients; correct?
18      A.  Well, we -- we made the change to the new
19  form.  We don't know if clients were given the form
20  or if they were using it.
21      Q.  Right.  But you used one form for all the
22  clients?  You didn't customize the form for each
23  client; correct?
24      A.  Some clients did have customized forms.
25      Q.  Okay.  But the vast majority used the same

---

Page 94

1  form; correct?
2      A.  Correct.
3      Q.  Okay.
4          MR. FRANCIS:  Mark this as Exhibit 7,
5  please.
6
7          (Plaintiff's Exhibit 7,
8          CONSENT TO REQUEST CONSUMER REPORT,
9          BATES STAMP NO. DEF00104, was
10         marked for identification.)
11
12      Q.  I'm handing you Plaintiff's Exhibit Number
13  7.  Could you identify that for me, please?
14      A.  This is another one of our consent and
15  disclosure forms.
16      Q.  Okay.  This is a version -- the version
17  that was amended in July of 2010; correct?
18      A.  According to the date on the bottom, yes.
19      Q.  Okay.  And would you have made this
20  amendment?
21      A.  Yes, most likely.
22      Q.  Do you know -- do you know what the
23  circumstances were which prompted you to revise the
24  consent and disclosure form in July of 2010?
25      A.  It may have been one of the credit laws in

---

Page 95

1  this paragraph, but I'm not positive off the top of
2  my head.
3      Q.  Okay.  If you look at the third full
4  paragraph, that begins, "I acknowledge receipt of
5  the attached summary of my rights under the Fair
6  Credit Reporting Act."  Do you see that?
7      A.  Correct.
8      Q.  Do you know of any part of the Fair
9  Crediting Reporting Act or any law which requires
10  the provision of that information in a consent and
11  disclosure form?
12      A.  No.
13      Q.  Okay.  And, likewise, the paragraph
14  underneath that begins, "This consent will not
15  affect," do you see that?
16      A.  Yes.
17      Q.  Is that language that either Jackson Lewis
18  or somebody from Sterling drafted?
19      A.  Yes.
20      Q.  Okay.  Do you know of any part of the Fair
21  Credit Reporting Act or any law which requires the
22  provision of that in a consent form?
23      A.  No.
24      Q.  Okay.  And if you look at the -- the
25  paragraph which begins, "In order to verify my

---

Page 96

1  identity for the purposes of report preparation, I
2  am voluntarily releasing my date of birth, social
3  security number, and the other information and fully
4  understand that all employment decisions are based
5  on legitimate non-discriminatory reasons," period.
6          Do you see that?
7      A.  Yes.
8      Q.  Do you know of any part of the Fair Credit
9  Reporting Act or any law which requires the
10  inclusion of that language in a consent form?
11      A.  No.
12      Q.  Do you know why that's there?
13      A.  Most likely drafted either by Jackson
14  Lewis or someone at Sterling
15      Q.  Okay.  And underneath that there are
16  certain provisions which pertain to California,
17  Massachusetts, Minnesota, New Jersey, and Oklahoma
18  law.  Do you see that?
19      A.  Correct.
20      Q.  And one which deals with a Maine
21  applicants.  Do you see that?
22      A.  Yes.
23      Q.  One which deals with Connecticut,
24  Maryland, Oregon, and Washington State applicants.
25  Do you see that?

---

24  (Pages 93 to 96)

Page 97

1    A.  Yes.
2    Q.  Okay.  And one deals with -- a paragraph
3  deals with New York applicants only.  Do you see
4  that?
5    A.  Yes.
6    Q.  And one deals with California applicants
7  and residents at the bottom.  Do you see that?
8    A.  Yes.
9    Q.  Do you know of any part of the Fair Credit
10  Reporting Act or any law which requires the
11  inclusion of that language in the FCRA stand-alone
12  consent form?
13    A.  No.
14    Q.  Okay.  Do you know why Sterling includes
15  that language in its consent forms?
16    A.  The various state laws.
17    Q.  Okay.
18      MR. FRANCIS:  Mark this as Plaintiff's
19  Exhibit Number 8, please.
20
21      (Plaintiff's Exhibit 8,
22      CONSENT TO REQUEST CONSUMER REPORT,
23      BATES STAMP NO. DEF00108, was
24      marked for identification.)
25

Page 98

1    Q.  Mr. Nager, I'm handing you Plaintiff's
2  Exhibit Number 8, probably familiar to you.  Could
3  you please let me know if you recognize it.
4    A.  It's one of our consent and disclosure
5  forms.
6    Q.  Okay.  And this is a consent and
7  disclosure form reflecting a modification that
8  occurred in September 2012; correct?
9    A.  Correct.
10    Q.  Okay.  And this is -- any modifications to
11  the consent form in 2012 would have been made by
12  you; correct?
13    A.  Yes.
14    Q.  All right.  And do you know why you
15  corrected or amended the standard consent and
16  disclosure form in -- in September of 2012?
17    A.  I believe it was one of the credit laws.
18    Q.  Okay.  And would you agree with me that,
19  at -- at least as of September of 2012, the standard
20  Sterling consent and disclosure form contained --
21  continue to contain the language regarding the
22  notification of -- for a consumer dispute within
23  five business days?
24    A.  Yes.
25    Q.  Okay.  And the state specific law

Page 99

1  information I asked you about a just moment ago;
2  correct?
3    A.  Yes.
4    Q.  Okay.
5      MR. O'NEIL:  I'd state for the record that
6  it looks like Exhibit Number 8 is a multi-page
7  document.  You've only showed him the first
8  page.
9      MR. FRANCIS:  That's correct.  Do you have
10  the other one?
11      MR. O'NEIL:  That's okay.  I just
12  wanted --
13      MR. FRANCIS:  No --
14      MR. O'NEIL:  -- to state it for the
15  record.
16      MR. FRANCIS:  -- you're right.  Just to be
17  clear, let's do it.
18    Q.  All right.  So let's -- Mr. Nager, would
19  you please just add this to Plaintiff's Exhibit
20  Number 8.  (Handing.)
21    A.  Okay.
22    Q.  Mr. O'Neil is correct, right, that that's
23  the remaining pages for the Plaintiff's Exhibit
24  Number 8; right?
25    A.  Yes.

Page 100

1    Q.  I was asking you about Plaintiff's Exhibit
2  Number 8, the first page of it, but it's actually a
3  multi-page document; correct?
4    A.  Correct.
5    Q.  To your knowledge, is -- is Plaintiff's
6  Exhibit Number 8 an accurate reflection of the
7  consent and disclosure form that the company is
8  currently using?
9    A.  It's not our most recent version, but in
10  general, yes.
11    Q.  Do you know what the most recent version
12  is?
13    A.  It's dated, I believe, 2 of 2013.
14    Q.  Okay.  And do you know what changes you
15  made in 2 of 2013?
16    A.  The in -- right above the first check box,
17  you have a list of addresses of offices.  Okay.  Our
18  Ohio address is added to that.
19    Q.  Okay.
20    A.  And I think that might be it.  I'd have
21  to -- I'd have to see the most recent form to say
22  definitely.
23    Q.  I'm going to let you see it, I think.
24      MR. FRANCIS:  Can you mark this as
25  Plaintiff's Exhibit Number 9, please.

25 (Pages 97 to 100)

Sanchez v. Sterling Infosystems, Inc., et al.

ADAM NAGER, 3/21/13

Page 101

```
 1
 2          (Plaintiff's Exhibit 9,
 3          CONSENT TO REQUEST CONSUMER REPORT,
 4          BATES STAMP NOS. DEF000887 - DEF000891,
 5          was marked for identification.)
 6
 7      Q.  Mr. Nager, I'm handing you Plaintiff's
 8  Exhibit Number 9, please identify that for me, if
 9  you can.
10      A.  This is another version of our consent and
11  disclosure form.
12      Q.  Okay.  When I was asking you about the
13  most current consent and disclosure form that
14  Sterling uses, is this the one you were referring
15  to?
16      A.  I think that there's even a more recent
17  one with the Ohio address.
18      Q.  Other than the Ohio address, does
19  Plaintiff's Exhibit Number 9 generally accurately
20  reflect the -- Sterling's standard consent and
21  disclosure form which it provides to its clients?
22      A.  Yes.
23      Q.  And is the language which appears
24  in Plaintiff's Exhibit Number 9, language which
25  would appear in all of the consent and disclosure
```

Page 102

```
 1  forms that Sterling would provide to its clients?
 2      A.  Yes.
 3      Q.  Okay.
 4          MR. O'NEIL:  Objection.  Vague as to time.
 5      Q.  Currently?
 6      A.  Currently, yes.
 7      Q.  Okay.
 8      A.  New clients would be given this form.
 9      Q.  Okay.  Are you familiar with a publication
10  that the company distributes called the Sterling
11  Sentinel?
12      A.  Yes.
13      Q.  Do you have any involvement in the -- in
14  the preparation of that publication and/or
15  contribute any information to it?
16      A.  Some of the articles I help with.
17      Q.  Okay.  Who is the person -- who is the
18  primary point person for the Sterling Sentinel?
19          MR. O'NEIL:  Objection.  Vague.
20      Q.  You can answer.
21      A.  At this point, it's Kristen -- what's her
22  last name?  Stewart?  I don't remember her last
23  name.  Kristen Adams.
24      Q.  Okay.  And what is the Sterling Sentinel
25  used for?
```

Page 103

```
 1      A.  It's distributed to clients for -- to
 2  alert them of new laws, best practices, industry
 3  updates, product highlights.
 4      Q.  And you contribute information to it on a
 5  regular basis?
 6      A.  Yes.
 7      Q.  What type of information do you --
 8      A.  If there's a new law update, we'll put
 9  that in.  Sometimes we'll -- just facts about
10  states.
11      Q.  Okay.
12          MR. FRANCIS:  Mark Plaintiff's Number 10,
13  please.
14
15          (Plaintiff's Exhibit 10,
16          SUPPLEMENTAL RESPONSES,
17          SIX-PAGE DOCUMENT, was marked
18          for identification.)
19
20      Q.  Mr. Nager, I'm handing you Plaintiff's
21  Exhibit Number 10.  It's a multi-page document.
22  Please look through it, and tell me if you can
23  identify it for me, please.
24      A.  Yes, I signed this the other day.
25      Q.  Okay.  When you say the -- "this," you --
```

Page 104

```
 1      A.  This document.
 2      Q.  Okay.  If you look on page 5 of
 3  Plaintiff's Exhibit Number 10, is that your
 4  handwriting, or is that your signature?
 5      A.  Yes, it is.
 6      Q.  Okay.  Among other things, my office
 7  served Sterling's counsel with a request for a
 8  witness who could testify regarding certain
 9  numerical-type information that plaintiff had
10  requested in -- in written discovery.  And you have
11  been designated to, at least, answer some of those
12  questions.  Okay.  So let me begin with
13  Interrogatory Number 2.  Okay.  It asks, "State the
14  total number of employment consumer reports which
15  contained adverse criminal or public record
16  information that the defendant sent," slash, "sold
17  to any third party from March 6, 2010, to the
18  present."
19          Do you see that?
20      A.  Yes.
21      Q.  And there's an answer to that.  That --
22  there's a response and there's a supplemental
23  response.  Do you see those?
24      A.  Yes.
25      Q.  Okay.  Would you tell me what you did
```

26 (Pages 101 to 104)

Sanchez v. Sterling Infosystems, Inc., et al.

ADAM NAGER, 3/21/13

Page 105

1   and/or learned to verify that the information
2   provided in response to Interrogatory Number 2 is
3   correct?
4       A.  Okay.  I had spoken our -- the person who
5   runs her reports.  Her name is Mia.  And she had
6   given me these figures and explained how she got
7   them from the database.
8       Q.  Okay.  Let's start with response to
9   Interrogatory Number 2.  Among other things it reads
10  that, "Defendant states that 691,828 employment
11  consumer reports prepared by Sterling Testing
12  Systems were provided" -- "and provided to clients
13  contained adverse or public record information from
14  January 1st, 2010, to the present."
15          Do you see that?
16      A.  Yes.
17      Q.  Is that accurate?
18      A.  Yes, according to the report we ran.
19      Q.  Okay.  What's Mia's full name?
20      A.  Mia Kalikman, K-A-L-I-K-M-A-N.
21      Q.  Okay.
22      A.  Possibly.
23      Q.  And do you know her?
24      A.  Yes.
25      Q.  What is her position at the company?

Page 106

1       A.  She runs reports.  I don't know her exact
2   title.
3       Q.  Prior to this assignment and your
4   deposition today, had you interacted with her, at
5   all, regarding the running of reports?
6       A.  I've asked her for -- I've asked her to
7   run reports in the past for me, yes.
8       Q.  Okay.  Did you speak to her about what she
9   did in order to ascertain these numbers?
10      A.  Yes, she explained it to me.
11      Q.  Okay.  What -- what did she do?
12      A.  She -- she basically accesses our Sequel
13  database.  And it's a reporting database which
14  mirrors our transactional database.  And you put in
15  the input criteria that you want, such as your date
16  range, whether you want criminal hits, any other
17  information, and it will run a report.
18      Q.  Okay.  What is Sequel?
19      A.  It's just a database.
20      Q.  What information is contained there?
21      A.  Everything from our tracker system, which
22  is Sterling East.
23      Q.  Okay.  Is this actually the database which
24  contains background checks that Sterling has
25  provided the clients in the past?

Page 107

1       A.  It mirrors that database.
2       Q.  Okay.  So it makes a copy of that
3   database?
4       A.  Correct.
5       Q.  Okay.  And then it's able to perform
6   quantitative queries on that information?
7       A.  Exactly.
8       Q.  Okay.  So if somebody were to have had a
9   background check run on them by Sterling in 2010,
10  for example, is that -- will that information be in
11  the Sequel database?
12      A.  Yes.
13      Q.  Okay.  Are all background checks performed
14  by Sterling and all the information Sterling has
15  returned to a client in response to a background
16  check within that Sequel database?
17      A.  On Sterling East, yes.
18      Q.  All right.  And I think you -- you stated
19  that that database is query-able by date range;
20  correct?
21      A.  Yes.
22      Q.  All right.  And is that database
23  query-able by search term?
24      A.  You can put in whether you want hits.  I
25  don't know if it's query-able by actual term.

Page 108

1       Q.  Okay.  If, for example, you wanted to see
2   how many Rhode Island records were returned in
3   connection with a background check, is it able to do
4   that?
5       A.  That, I'm not sure about.
6       Q.  Okay.  If you wanted to search it for --
7   to determine how many misdemeanor records were
8   returned during a certain period of time in
9   connection with background checks, would that be
10  searchable?
11      A.  I believe so.
12      Q.  Okay.  Is it -- is it -- are you able to
13  search the Sequel database by name in order to
14  retrieve what was sold about a particular consumer
15  at a certain time?
16      A.  We wouldn't search that database to find
17  out something about a particular consumer.  It would
18  probably go through our tracker database.  But that
19  information would also be in the Sequel database,
20  but I don't think we would use it in that fashion.
21      Q.  Okay.  Is -- are you able to query the
22  Sequel database to determine the number of
23  background reports that Sterling sold to a
24  particular client during a particular time period?
25      A.  Yes.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Sanchez v. Sterling Infosystems, Inc., et al.                                    ADAM NAGER, 3/21/13

Page 109

1      Q.  So if you wanted to find out how many
2   reports Sterling sold to its client, SBM, for a
3   particular time period, it could do that; right?
4      A.  Yes.
5      Q.  Okay.  Do you know -- do you know when
6   a -- when Mia performed the queries which provide
7   the basis for the responses to Interrogatories
8   Number 2 and 5?
9      A.  Do you know what -- do I know exactly what
10  date?
11     Q.  When --
12     A.  No.
13     Q.  -- approximately.
14     A.  No.  I know she did it whenever Joe
15  Rotondo had requested it.
16     Q.  Okay.
17        MR. O'NEIL:  I can tell you on behalf of
18  Sterling that the response to Number 2 -- the
19  initial response to Number 2 was generated in
20  approximately September of 2012.  And the
21  response -- initial response to Interrogatory
22  Number 5 was done in approximately November 23,
23  2012.
24        MR. FRANCIS:  Okay.  Thank you.
25        MR. O'NEIL:  And -- yeah.

Page 110

1      Q.  If you look at the supplemental response
2   to Interrogatory Number 2, among other things it
3   reads that, "This number differs from the number
4   provided by defendant on December 3rd, 2012, for
5   three reasons."  And it lists three reasons.
6        The third reason reads, "The number in the
7   supplemental response reflects the subtraction of
8   reports from the original number that were not
9   delivered to customers of Sterling East."  Do you
10  see that?
11     A.  Yes.
12     Q.  What does that mean?
13     A.  Sterling East has -- was the main company
14  and through our tracker system, after acquiring
15  other companies, we would supply certain reports to
16  those companies through tracker.  So we'll say
17  Sterling West, which is our absolute platform, might
18  fulfill a jurisdiction through Sterling East, and so
19  it's being routed through them.  So those are
20  actually not going to a Sterling East customer,
21  they're going to a Sterling West customer through a
22  group ID.
23     Q.  I see.  Okay.
24        MR. O'NEIL:  Mr. Francis.
25        MR. FRANCIS:  Yes.

Page 111

1        MR. O'NEIL:  I also want to clarify that
2   we learned after we served these, the number in
3   the supplemental response to Interrogatory
4   Number 2 is actually overstated by 685 reports,
5   because of the same reason -- and Mr. Nager
6   just explained it -- 685 of the reports
7   included in the original number, actually, were
8   also for non-Sterling East customers.  So the
9   number 524361, actually, should be reduced by
10  685.
11        MR. FRANCIS:  Okay.
12     Q.  Is what Mr. O'Neil just said correct?
13     A.  Correct.
14     Q.  Okay.
15        MR. O'NEIL:  Just trying to make myself
16  useful here.
17     Q.  Okay.  Turning your attention to
18  Interrogatory Number 5.  Interrogatory Number 5
19  request, "State the total number of job applicants
20  from whom you obtained a consent and disclosure form
21  similar to the one you obtained from the plaintiff,
22  attached hereto as Exhibit A."
23        And there are two responses here:  A
24  response from December 3rd, 2012, and one from -- a
25  supplemental one.  Among other things in -- in

Page 112

1   connection with the first response, it states that,
2   "In some instances, defendant's clients utilize an
3   Electronic Wet Signature program offered by
4   defendant."  Do you see that?
5      A.  Yes.
6      Q.  Can you tell me what that means.  What's
7   an Electronic Wet Signature?
8      A.  That's our EWS module, which basically an
9   invitation is sent to the client, and they sign the
10  consent form electronically with their mouse.
11     Q.  When you say "the client does," you mean
12  they -- the -- your employer -- the employer?
13     A.  The employ -- the employer uses our system
14  to send the consent form to their applicant
15  electronically.
16     Q.  Okay.  So is -- are you saying that in
17  those instances the consumer is not signing an
18  actual form?
19     A.  They're not signing a paper form, correct.
20     Q.  They're using electronic -- what are they
21  doing?
22     A.  They use their mouse to sign their
23  signature.
24     Q.  Okay.  They're accessing Sterling's system
25  somehow online --

28  (Pages 109 to 112)

Sanchez v. Sterling Infosystems, Inc., et al.                     ADAM NAGER, 3/21/13

| Page 113 |
| --- |

1    A.   Correct.
2    Q.   -- and then -- and using their mouse to
3  click something; right?
4    A.   Not click.  To try and sign your name with
5  a mouse.
6    Q.   Okay.  And are those instances, are they
7  documented in Sterling's Sequel system?
8    A.   Yes.
9    Q.   Okay.  Are the versions of the consent and
10 disclosure form that the client signed, are they
11 contained within the Sequel system?
12   A.   No.
13   Q.   What is contained within the Sequel system
14 as it pertains to the Electronic Wet Signature?
15   A.   The number and the applicants.
16   Q.   The number of what?
17   A.   The number of applicants that signed it,
18 and the -- the names of the applicants.
19   Q.   Okay.  And the date; correct?
20   A.   Correct, the date would be there as well.
21   Q.   Okay.  And would you be able --
22   A.   And for what client.
23   Q.   Okay.  Would you be able to tell, based
24 upon the date that a form was being used, what
25 version of the form the client signed?

| Page 114 |
| --- |

1    A.   Not definitely.
2    Q.   Would you be able to come to a fairly
3  accurate understanding?
4    A.   Possibly.  It -- depending on when it is.
5  · I think some we have actual -- we've kept the forms
6  more recently.  The first versions, not -- not as
7  much.
8    Q.   When did the company begin using the
9  Electronic Wet Signature program?
10   A.   About 2009.
11   Q.   Do you know whether or not the -- the
12 plaintiff in this case, Mr. Sanchez, utilized the
13 EWS program?
14   A.   He did not.
15   Q.   Okay.  It was a -- he signed a manual
16 form; correct?
17   A.   Correct.
18   Q.   Okay.  All right.  The answer also reads
19 that, "Hard copies of the electronic consent and
20 disclosure form utilized by defendant have been
21 provided to plaintiff.  Between March 6, 2010, and
22 November 23rd, 2012, 194,558 applicants and/or
23 employees of defendant, Sterling East's clients
24 executed electronic consent and disclosure forms
25 through the EWS program," period.

| Page 115 |
| --- |

1       Do you see that?
2    A.   Yes.
3    Q.   Is that accurate?
4    A.   According to the report -- report Mia ran,
5  yes.
6    Q.   Okay.  Did you learn of the information
7  from Mia in a report, or she just told you these
8  figures?
9    A.   I didn't see the report.  She just told me
10 the figures.
11   Q.   Okay.  And then you used that information
12 to verify that these answers were correct; right?
13   A.   Well, I haven't verified it.  I just took
14 her word for it that they're correct.
15   Q.   When I say you verified, I mean you signed
16 this verification?
17   A.   Yes  Uh-huh.
18     MR. O'NEIL.  Mr. Nager was verifying the
19 supplemental response, not the initial
20 response.
21   Q.   Okay.  Okay.  Turning to the supplemental
22 response to Interrogatory Number 5, it reads,
23 "Responding further, and subject to without waiving
24 its objections, defendant states that between March
25 6, 2010, and March 5th, 2013, 191,684 unique

| Page 116 |
| --- |

1  applicants and/or employees of Sterling East's
2  clients executed electronic consent and disclosure
3  forms through the EWS program," period.
4       Do you see that?
5    A.   Yes.
6    Q.   That's correct; right?  You verified that
7  as being correct --
8    A.   Yes.
9    Q.   - right?
10   A.   Uh-huh.  Correct.
11   Q.   And what did Mia do to determine that
12 number?
13   A.   She had ran the report.  This was actually
14 run -- this was actually created by someone by the
15 name of Madge Patterson, who took the data and
16 eliminated other repeat applicants, applicants with
17 no order connected to them.  There was also some
18 test in dummy accounts that were still there that
19 hadn't been eliminated, so those were eliminated as
20 well.
21   Q.   Okay.  I was asking you questions about --
22 and was that information gleaned from Sequel?
23   A.   Yeah, that was from the -- the Sequel
24 database.
25   Q.   All right.  And I asked you some questions

29  (Pages 113 to 116)

Sanchez v. Sterling Infosystems, Inc., et al.                          ADAM NAGER, 3/21/13

Page 117

1  about what Sequel was capable of -- of determining.
2  If you -- I think you told me, correct me if I'm
3  wrong, that in Sequel you could determine the number
4  of applicants for whom Sterling sold a background
5  check on behalf of a particular client during a
6  particular time period; correct?
7       A.  Yes  You may have to manipulate the data
8  afterwards on a spreadsheet to get the result that
9  you want, but, yes.
10      Q.  And then, would I also be correct that you
11  could then take that information, if you needed to,
12  and find out exactly who the identity of those
13  consumers were --
14      A.  Yes, it would have their --
15      Q.  -- who they were; correct?
16      A.  Correct.  Yes.
17      Q.  Okay.
18          MR. FRANCIS:  Let me go off the record.
19          MR. O'NEIL:  12:37.  Off the record.
20
21          (A recess was taken.)
22
23          THE VIDEOGRAPHER:  It's 12:49.  On the
24  record.
25

Page 118

1  BY MR. FRANCIS:
2       Q.  Mr. Nager, we're going to wrap up here in
3  just a second, but before I do, I just want to ask
4  you a couple of follow-up questions regarding what
5  we've gone over today, thus far.  Okay?
6       A.  Okay.
7       Q.  Do you remember my asking you about
8  changes to the consent and disclosure forms that
9  Sterling has made over the last several years?
10      A.  Yes.
11      Q.  Okay.  And am I correct that at some point
12  in 2008, according to the form's dates, Sterling
13  ceased using the paragraph which began with, "In
14  exchange," and it contained a release?
15      A.  Correct.
16      Q.  When the company stopped including that
17  language in its consent and -- disclosure forms,
18  did it notify its clients to stop using that form?
19      A.  Again, it would have been -- I would
20  have -- we would have sent out the update to our
21  client-facing teams, and they would have sent it
22  out.
23      Q.  Okay.  My question is a little narrower.
24  Other than distributing a new concept and disclosure
25  form, as the company would do from time to time, did

Page 119

1  it inform its clients to cease using the old form?
2       A.  In a communication, we would probably say
3  to stop using earlier versions, that -- that this is
4  the most recent.
5       Q.  Do you know whether the company --
6       A.  I --
7       Q.  -- you actually did that?
8       A.  I can't say definitely.
9       Q.  Okay.  Do you have any recollection of
10 actually telling your clients:  Don't use that form
11 anymore, we think it's non-compliant?
12      A.  No, I don't.
13          MR. FRANCIS:  Okay.  No further questions.
14          MR. O'NEIL:  Okay.  I have a few
15 follow-up, clarifying questions myself.
16
17 EXAMINATION BY
18 MR. O'NEIL:
19      Q.  I refer you, Mr. Nager, to -- let me see
20 what exhibit.
21          Mr. Francis asked you a number of
22 questions including just the last set of questions
23 regarding Sterling's policies and procedures for
24 making the consent forms available to its clients.
25 Do you recall that testimony?

Page 120

1       A.  Yes.
2       Q.  And does that testimony apply to all of
3  the forms that Mr. Francis has shown to you today?
4       A.  Yes.  We would have -- we would have
5  notified clients by -- I would have notified
6  client-facing teams by e-mail, and they would send
7  it out.
8       Q.  And those were the policies and procedures
9  of Sterling in terms of Sterling distributing the
10 forms to its clients; correct?
11          MR. FRANCIS:  Objection.  Leading.
12      A.  Correct.  The only other thing would be to
13 update it on our Web site and then the EWS modules.
14      Q.  In all of your testimony today regarding
15 Sterling's policies and procedures for distributing
16 consent forms to its clients, did those policies and
17 procedures that you described also apply to the
18 consent form which has been marked as Plaintiff's
19 Exhibit Number 4?
20      A.  Yes.
21      Q.  Now, Mr. Francis asked you some questions
22 about the dates on the bottom of some of the forms.
23 Do you recall that?
24      A.  Yes.
25      Q.  And I believe you indicated that that

30  (Pages 117 to 120)

Page 121

1  would indicate approximately the date that a form
2  had been updated; correct?
3       MR. FRANCIS: Objection. Leading.
4    A.  Correct.
5       MR. O'NEIL: Just background. Just trying
6  to refresh his recollection. If you think that
7  I misstated his testimony, he can make --
8       MR. FRANCIS: Well, I don't think he said
9  he doesn't recall, but I don't think you've
10  established that he has no recollection.
11  But --
12       MR. O'NEIL: Okay. Well, I'm not going to
13  reference your earlier testimony.
14    Q.  When Sterling made any type of change to a
15  form, did it always create a new form with a new
16  date?
17    A.  No.
18    Q.  So could you explain why that's the case?
19    A.  Just wasn't updated. So sometimes we
20  might have had an update done on -- say this form
21  on -- Exhibit Number 4 as an example. An up -- I
22  know an update was done on 2/12 of '08. I can't say
23  that that was the only update and that there wasn't
24  one four months later, and we didn't change the
25  date.

Page 122

1    Q.  So is it your testimony then that
2  sometimes you updated the forms, but did not put a
3  new date on them?
4    A.  Correct.
5    Q.  Mr. Francis showed you Exhibit Number 3,
6  and there is a place in a couple of paragraphs
7  where, in brackets, it says "company name." Do you
8  see that?
9    A.  Yes.
10    Q.  And what was that bracket supposed to
11  indicate?
12    A.  The company who was using it, the name is
13  supposed to be inserted there.
14    Q.  Okay. And then on Exhibit 5 that Mr.
15  Francis showed you, under the first three
16  paragraphs, there's also bracketed language in
17  boldface. It says, "be specific", right?
18    A.  Correct.
19    Q.  And what's indicated by those brackets?
20    A.  The -- the client is supposed to insert
21  their services that they're running.
22    Q.  Okay. So at least some of the forms that
23  Sterling provided had to be modified in order for
24  the client to use it; correct?
25    A.  Correct.

Page 123

1    Q.  Okay. And when the forms were provided by
2  Sterling to its clients, could the clients make
3  other changes to the forms?
4    A.  At one point that they were locked, and
5  then at other points we just started releasing them
6  unlocked to clients. There was plenty of unlocked
7  forms floating around the office anyway.
8    Q.  Okay. And so if a form was unlocked, then
9  the client would be able to go into the form and
10  change it; correct?
11    A.  Correct.
12    Q.  And even when the form was locked, did you
13  think that that precluded the client from making
14  changes to the form?
15       MR. FRANCIS: Objection. Leading.
16    A.  No.
17    Q.  And the client could have also changed the
18  text of the forms as well; correct?
19    A.  Yes.
20    Q.  Some of the later forms that Mr. Francis
21  showed you had references to specific language
22  relating to applicants in specific states; right?
23    A.  Correct.
24    Q.  But then some of the earlier forms, like
25  Exhibit Number 4, did not have any state-specific

Page 124

1  language in it; correct?
2    A.  Well, this one has from Minnesota and
3  Oklahoma.
4    Q.  Okay. And that form is dated 2/12/08.
5  Was that the only form -- Exhibit 4, was that the
6  only form that Sterling made available on or about
7  2/12 of 2008?
8    A.  No.
9    Q.  What other forms would have been made
10  available?
11    A.  We originally had four consent forms, four
12  standard consent forms. This one had the Minnesota
13  and Oklahoma language on it. There was another one
14  that had California language on it. Another one for
15  Washington State. And I believe the other one was
16  Maine.
17    Q.  Okay. So when Sterling would issue a new
18  consent and disclosure form, in fact, there might be
19  more than one version of that form; correct?
20    A.  Correct. We'd issue four to most
21  companies.
22    Q.  And the verbiage on those different forms
23  issued at the same time would differ; correct?
24    A.  Correct.
25       MR. O'NEIL: I have no further questions.

31  (Pages 121 to 124)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 125

```
 1     Thank you.
 2         MR. FRANCIS: I have a couple follow-up
 3     based on that.
 4
 5     FURTHER EXAMINATION
 6     BY MR. FRANCIS:
 7         Q.  Just to follow up on what Mr. O'Neil was
 8     just asking you about.
 9             He asked you whether or not -- in
10     reference to the -- Exhibit Number 4, the form that
11     was being used in February 12, 2008, whether there
12     were various versions of it; correct?
13         A.  Correct.
14         Q.  Okay.  And that he asked you did the
15     verbiage vary in those forms, from one to another;
16     correct?
17         A.  Yes.
18         Q.  Am I not correct, sir, that the verbiage
19     that begins with:  "In exchange for company's
20     consideration of my employment application through
21     background investigation," that paragraph we
22     asked -- we've asked about, or I've asked you about,
23     that was the same; correct?
24         A.  That would be the same.
25         Q.  Okay.  That standard language was in all
```

Page 126

```
 1     of them; correct?
 2         A.  Correct.
 3         MR. FRANCIS: Okay.  No further questions
 4         MR. O'NEIL:  We reserve signature.
 5         THE VIDEOGRAPHER:  Okay.  That concludes
 6     the deposition of Adam Nager.  The time is
 7     12:58 p.m.  Off the record.  End of DVD 2.
 8
 9             (Time noted: 12:58 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 127

```
 1              C E R T I F I C A T I O N
 2
 3     STATE OF NEW YORK      )
 4                           )  ss.
 5     COUNTY OF WESTCHESTER  )
 6             I, KATHERINE S. JURAC, Court Reporter
 7     and Notary Public within and for the County of
 8     Westchester, State of New York, do hereby certify:
 9             That I reported the proceedings that
10     are hereinbefore set forth, and that such transcript
11     is a true and accurate record of said proceedings.
12             AND, I further certify that I am not
13     related to any of the parties to this action by
14     blood or marriage, and that I am in no way
15     interested in the outcome of this matter.
16
17         IN WITNESS WHEREOF, I have hereunto set
18
19     my hand.
20
21
22
23         KATHERINE S. JURAC
24             Court Reporter
25
```

Page 128

```
 1     INSTRUCTIONS TO WITNESS FOR READING & SIGNING
 2             Read your deposition over carefully.
 3     It is your right to read your deposition and make
 4     changes in form or substance.  You should assign a
 5     reason in the appropriate column on the errata
 6     sheet for any change made.
 7             After making any changes in form or
 8     substance which have been noted on the following
 9     errata sheet along with the reason for any change,
10     sign your name on the errata sheet and date it.
11             Then sign your deposition at the
12     end of your testimony in the space provided
13     You are signing it subject to the changes you have
14     made in the errata sheet, which will be attached
15     to the deposition before filing.  You must sign it
16     in front of a witness  Have the witness sign in
17     the space provided.  The witness need not be a
18     notary public.  Any competent adult may witness
19     your signature.
20             Return the original errata sheet to your
21     counsel promptly.  Court rules require filing
22     within 30 days after you receive the deposition.
23
24
25
```

                                        32  (Pages 125 to 128)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 129

```
 1              ERRATA SHEET
 2    Attach to Deposition of: Adam Nager
      Taken on: March 21, 2013
 3    In the matter of: Sanchez v. Sterling Infosystems, Inc.
 4    PAGE  LINE NO.  CHANGE REASON
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

Page 130

```
 1             SIGNATURE PAGE
 2
                  - - -
 3
            I hereby acknowledge that I
 4
      have read the aforegoing transcript, dated
 5
      March 21, 2013, and the same is a true and
 6
      correct transcription of the answers given by
 7
      me to the questions propounded, except for
 8
      the changes, if any, noted on the errata
 9
      sheet.
10
                  - - -
11
12
13    SIGNATURE: _____
                    Adam Nager
14
15    DATE: _____
16
17    WITNESSED BY: _____
18
19
20
21
22
23
24
25
```

                                    33  (Pages 129 to 130)

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 130

```
 1                    SIGNATURE PAGE

 2                       - - -

 3            I hereby acknowledge that I

 4     have read the aforegoing transcript, dated

 5     March 21, 2013, and the same is a true and

 6     correct transcription of the answers given by

 7     me to the questions propounded, except for

 8     the changes, if any, noted on the errata

 9     sheet.

10                       - - -

11

12

13     SIGNATURE:        _____
                         Adam Nager
14

15     DATE:             5/2/2013
                         _____
16

17     WITNESSED BY:     _____

18

19

20

21

22

23

24

25
```

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Sanchez v. Sterling Infosystems, Inc., et al.                    ADAM NAGER, 3/21/13

Page 129

1                          ERRATA SHEET

2    Attach to Deposition of: Adam Nager
     Taken on: March 21, 2013
3    In the matter of: Sanchez v. Sterling Infosystems, Inc.

4    PAGE   LINE NO.   CHANGE REASON

5    11     18         Veronique Couverdiere      Spelling

6    30     21         Glen  Rambaran             Spelling

7    102    23         Kirsten  Adams             Spelling

8    105    5 and 20   Maryya  Kalikman           Spelling

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____


STERLING

PRINT CHARACTERS LIKE THIS
**ABCDE 98765**

CORRECT   INCORRECT

## CONSENT AND DISCLOSURE

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Applicant's First Name or Initial       Last Name

I understand that [Company Name] ("COMPANY") will utilize the services of STERLING INFOSYSTEMS, INC., 249 West 17th Street, New York, NY 10011 ('STERLING'), as part of the procedure for processing my application for employment. I also understand that if my application for employment is granted, COMPANY may obtain further information through subsequent investigations by STERLING so as to update, renew or extend my employment, to the extent permitted by law.

I understand a consumer reporting agency's investigation may include obtaining information regarding bankruptcies covering up to the last ten (10) years, obtaining information regarding civil suits, civil judgments, arrest records, and paid tax liens covering up to the last seven (7) years, obtaining information regarding any other adverse item of information covering up to the last seven (7) years and obtaining information regarding references and educational and employment verifications without any time limitations, subject to any limitations or exceptions applicable under state and federal law. The investigation also may include obtaining information relating to criminal records without any time limitations, subject to state law.

In the event an investigative consumer report is conducted, I understand such information may be obtained by personal interviews with my acquaintances or associates or with others whom I am acquainted or who may have knowledge concerning my character, general reputation, personal characteristics or standard of living. I understand such information may also be obtained through direct or indirect contact with former employers, schools, financial institutions, landlords and public agencies or other persons who may have such knowledge.

I understand that I have the right to receive notice about the nature and scope of any investigative consumer report requested within five days after the COMPANY receives my request or five days after the investigative consumer report was requested, whichever is later.

☐   By checking the box, I indicate that I wish to receive further disclosure about the nature and scope of any COMPANY request for an investigative consumer report.

I acknowledge that I have received the attached summary of my rights under the Fair Credit Reporting Act

I also understand that before I am denied employment based, in whole or part, on information obtained in the consumer report and/or investigative consumer report, I will be provided a copy of the report and a description in writing of my rights under the Fair Credit Reporting Act. I understand if I disagree with the accuracy of any information in the report, I must notify COMPANY within five business days of my receipt of the report that I am challenging the accuracy of the information contained in this report with STERLING and advise COMPANY as to the basis of my challenge.

In exchange for COMPANY's consideration of my employment application, I agree not to file or pursue any complaints, claims or legal actions of any kind against STERLING for providing the aforementioned information. I also agree not to file or pursue any complaints, claims or legal actions against COMPANY or any of its employees, representatives, or agents arising out of or in any way related to conducting a background investigation.

I am consenting that a photocopy of this authorization be accepted with the same authority as the original, and I specifically waive any written notice from any entity which may provide information based on this authorized request.

I hereby consent to this investigation and authorize COMPANY to procure a consumer report and/or investigative consumer report on my background as stated above from STERLING. In order to verify my identity for purposes of the background investigation I am voluntarily releasing my date of birth, social security and the other information below for my own benefit and fully understand that all employment decisions are based on legitimate non-discriminatory reasons.

**Minnesota & Oklahoma Applicants Only:** I have the right to request a copy of the consumer report obtained by COMPANY from STERLING by filling in the circle below. STERLING will mail the consumer report directly to me.

**Minnesota Applicants Only:** I have the right to make a written request to the consumer reporting agency to provide me with a complete and accurate disclosure of the nature and scope of any consumer report obtained by COMPANY from STERLING.

☐   I wish to receive a copy of the consumer report. (Check the box only if you are a Minnesota or Oklahoma applicant and wish to receive a copy)

PLAINTIFF
EXHIBIT   4
DATE 3/21/13 RPTR
DALCO REPORTING

DEF00096

▶▶ STERLING

| PRINT CHARACTERS LIKE THIS | CORRECT | INCORRECT |
|---|---|---|
| ABCDE 98765 | ● | ⌀ ⊠ ⊗ |

## Consent to Request Consumer Report & Investigative Consumer Report Information

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Applicant's First Name or Initial          Last Name

I understand that [Company Name] ('COMPANY') will utilize the services of Sterling InfoSystems Inc., 249 West 17th Street, New York, NY 10011, (877) 424-2457 to obtain a consumer report and/or investigative consumer report as part of the procedure for processing my application for employment. I also understand that if my application for employment is granted, to the extent permitted by law, COMPANY may obtain further information through subsequent investigations by STERLING so as to update, renew or extend my employment.

I understand that Sterling InfoSystems Inc. ("STERLING") investigation may include obtaining information regarding my credit background, bankruptcies, driving record, lawsuits, judgments, paid tax liens, unlawful detainer actions, failure to pay spousal or child support, accounts placed for collection, and criminal record, subject to any limitations imposed by applicable federal and state law. I understand such information may be obtained through direct or indirect contact with former employers, schools, financial institutions, landlords and public agencies or other persons who may have such knowledge. If an investigative consumer report is being requested, I understand such information may be obtained through any means, including but not limited to personal interviews with my acquaintances and/or associates or with others whom I am acquainted or who may have knowledge concerning my character, general reputation, personal characteristics or standard of living.

The nature and scope of the investigation sought is as follows: [Be Specific] |

I acknowledge that I have received the attached summary of my rights under the Fair Credit Reporting Act and, as required by law, any related state summary of rights.

This consent will not affect my ability to question or dispute the accuracy of any information contained in my report. I understand if COMPANY makes a conditional decision to disqualify me based all or in part on my report, I will be provided with a copy of the report and another description in writing of my rights under the federal Fair Credit Reporting Act and, as required by law, any related state summary of rights, and if I disagree with the accuracy of the purported disqualifying information in the report, I must notify COMPANY within five business days of my receipt of the report that I am challenging the accuracy of such information with Sterling InfoSystems Inc.

I hereby consent to this investigation and authorize COMPANY to procure a consumer report(s) and/or investigative consumer report on my background as stated above from a consumer reporting agency and/or investigative consumer reporting agency.

In order to verify my identity for the purposes of background identification, I am voluntarily releasing my date of birth, social security number and the other information below for my own benefit and fully understand that all employment decisions are based on legitimate non-discriminatory reasons.

☐ **California, Minnesota & Oklahoma Applicants Only:** I have the right to request a copy of the consumer report obtained by COMPANY from STERLING by checking the box. STERLING will mail the consumer report directly to me. I wish to receive a copy of the consumer/investigative consumer report. (Check only if you wish to receive a copy.)

☐ **Maine Applicants Only:** By checking the box, I indicate that I wish to receive the name, address and telephone number of the nearest unit of the consumer reporting agency designated to handle inquiries regarding the investigative consumer report.

☐ **Washington State Applicants Only (AS APPLICABLE):** I further understand that COMPANY will not obtain information about my "credit worthiness, credit standing, or credit capacity" unless the information is required by law, or is substantially job related, and the reasons for using the information are disclosed to me in writing. (If this option is checked, complete the question below.) Reasons why COMPANY considers information about "credit worthiness, credit standing, or credit capacity" as substantially job related:

_____

**NY Applicants Only:** I also acknowledge that I have received the attached copy of Article 23A of New York's Correction Law. I further understand that I may review and receive a copy of any investigative consumer report by contacting the consumer reporting agency. I further understand that I will be advised if any further checks are requested and provided the name and address of the consumer reporting agency.

**California Applicants and Residents:** If I am applying for employment in California or reside in California, I understand I have the right to inspect visually the files concerning me maintained by an investigative consumer-reporting agency during normal business hours and upon reasonable notice. The inspection can be done in person if I appear in person and furnish proper identification; I am entitled to a copy of the file for a fee not to exceed the actual costs of duplication. I am entitled to be accompanied by one person of my choosing, who shall furnish reasonable identification. The inspection can also be done via certified mail if I make a written request, with proper identification, for copies to be sent to a specified addressee. I can also request a summary of the information to be provided by telephone if I make a written request, with proper identification for telephone disclosure, and the toll charge, if any, for the telephone call is prepaid by or directly charged to me. I further understand that the investigative consumer-reporting agency shall provide trained personnel to explain to me any of the information furnished to me; I shall receive from the investigative consumer reporting agency a written explanation of any coded information contained in files maintained on me. "Proper identification" as used in this paragraph means information generally deemed sufficient to identify a person, including documents such as a valid driver's license, social security account number, military identification card and credit cards.

Signature: _____     Today's Date: _____

PLAINTIFF
EXHIBIT 5
DATE 3/21/13 RPTR
DALCO REPORTING

DEF00100