# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE No. 14 CV 3076
- - - - - - - - - - - - - - - - - - - - - - - - - -x
KEVIN ALEXANDER JONES, on behalf of himself and others
similarly situated,

                              Plaintiff,
                -against-

STERLING INFOSYSTEMS, INC.,

                              Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - -x
CASE NO.:  14-cv-03125b
- - - - - - - - - - - - - - - - - - - - - - - - - -x
KEVIN ALEXANDER JONES, on behalf of himself and others
similarly situated,

                              Plaintiff,
                -against-

HALSTEAD MANAGEMENT COMPANY, LLC, BROWN HARRIS
STEVENS LLC GROUP, BROWN HARRIS STEVENS, LLC, AND
TERRA HOLDINGS, LLC

                              Defendants.


           and

HALSTEAD MANAGEMENT COMPANY, LLC, BROWN HARRIS
STEVENS RESIDENTIAL MANAGEMENT, LLC,
                      Third-Party Plaintiffs,
STERLING INFOSYSTEMS, INC., d/b/a
STERLINGBACKCHECK,
- - - - - - - - - - - - - - - - - - - - - - - - - -x

           DEPOSITION OF KEVIN ALEXANDER JONES
                  New York, New York
                Tuesday, December 2, 2014


REPORTED BY: DANIELLE GRANT
JOB NO. 12976

1

2

3

4

5

6

7

8

9

10

11

12                    December 2, 2014

13                      9:36 a.m.

14

15

16

17

18           Deposition of KEVIN ALEXANDER JONES, held at

19    the offices of Reed Smith, LLP, 599 Lexington

20    Avenue, New York, New York pursuant to Notice

21    before DANIELLE GRANT, a Shorthand Reporter and

22    Notary Public of the State of New York.

23

24

25

```
 1

 2     A P P E A R A N C E S:

 3

       FRANCIS & MAILMAN, P.C.
 4     Attorneys for the Plaintiff
       100 South Broad Street, 19th Floor
 5     Philadelphia, Pennsylvania 19110
       BY:  DAVID A. SEARLES, ESQ., of Counsel
 6          dsearles@consumerlawfirm.com
            (215)735-8600
 7

 8     REED & SMITH, LLP
       Attorneys for the Defendants
 9     10 South Wacker Drive, 40th Floor
       Chicago, Illinois 60606
10     BY:  MICHAEL O'NEIL, ESQ., of Counsel
            michael.oneil@reedsmith.com
11          (312)207-2879

12     VENABLE LLP
       Attorneys for the Halstead
13     1270 Avenue of the Americas, 24th Floor
       New York, New York 10020
14     BY:  EDMUND M. O'TOOLE, ESQ., of Counsel
            emotoole@venable.com
15          (212)953-3388

16     LEGAL ACTION CENTER
       Attorneys for the Plaintiff
17     225 Varick Street
       4th Floor
18     New York, New York 10014
       BY:  MONICA WELBY, ESQ., of Counsel
19          (212)243-1313

20

21

22

23

24

25
```

1                   KEVIN ALEXANDER JONES

2    other people.

3          Q    What steps did you take to apply

4    for that job, sir?

5          A    An interview was set up with

6    Mr. Barton.

7          Q    Did you contact Mr. Barton?

8          A    If I'm not mistaken, Paul himself

9    actually set it up.  He said go see him at --

10   I'm not sure what time, 12:00 o'clock at this

11   address, mention my name, meaning his name.

12         Q    So you had an appointment to meet

13   with Mr. Barton at his office?

14         A    Yes.

15         Q    That was in July of 2012, right?

16         A    Yes.

17         Q    What did Mr. Barton tell you about

18   the position?

19         A    Basically the same thing Paul

20   said, there's a temporary position.  There's a

21   possibility of full-time, no guarantees.  You

22   will be paid $16 an hour, doorman slash porter

23   and we'd love to have you.  That's one of the

24   last things he said to me.

25         Q    Did you understand that you were

1                    KEVIN ALEXANDER JONES

2      being interviewed for a temporary position in a

3      particular building?

4           A    Yes.

5           Q    Which building was that, sir?

6           A    The same building, 45 East 62nd.

7           Q    And if you got the job, you'd be

8      working there while the normal doorman or

9      porter was on vacation, correct?

10          A    I believe that was part of it too,

11     yes.

12          Q    Did you have an understanding as

13     to when that vacation was going to begin?

14          A    No.

15          Q    Did you understand that you

16     would -- if you got the job, you'd start

17     working once that vacation began?

18          A    My understanding was the job would

19     start immediately.

20          Q    How do you -- I'm sorry, I

21     interrupted you.  How did you get that

22     understanding?

23          A    That was from Mr. Barton himself,

24     also Paul.

25          Q    So the records show that and I

                    KEVIN ALEXANDER JONES

1

2     think the lawsuit alleges that you met with Mr.

3     Barton on July 12th?

4          A    Yes.

5          Q    So when -- is it your testimony

6     that Mr. Barton told you the job would start

7     immediately?

8          A    Yes.

9          Q    Would it start at the building on

10    East 62nd Street?

11         A    Yes.

12         Q    So by immediately, did that mean

13    at the end of the interview he wanted you to go

14    to the building?

15         A    No.  In other words, they were

16    looking for someone to hire immediately.

17    Interview, paperwork, my assumption was start

18    working.  Timeframe not sure, but immediately

19    to me meant soon.

20         Q    Mr. Barton used the word

21    immediately?

22         A    Yes.

23         Q    You made reference to paperwork?

24         A    Yes.

25         Q    You understood that you had to

1                    KEVIN ALEXANDER JONES

2              THE WITNESS:  Correct.  Yes.

3         Q    Can you identify Exhibit No.  2

4    for the record, Mr. Jones?

5         A    Application for employment.

6         Q    And is that your handwriting on

7    Exhibit 2?

8         A    Yes.

9         Q    Is this the application that you

10   filled out at Halstead's offices after you left

11   Mr. Barton's office?

12        A    Yes.

13        Q    After you left Halstead's offices

14   on July 12, 2012, when was the next time you

15   had any communication with Halstead?

16        A    I believe it was July 16th, the

17   following Monday.

18        Q    Were you surprised you hadn't

19   heard from Halstead prior to that Monday?

20        A    No.

21        Q    Was that because you knew it was

22   going to take some time to process your

23   application?

24        A    No.

25        Q    Why weren't you surprised that it

1            KEVIN ALEXANDER JONES

2    took until July 16th to hear from Halstead?

3         A    It's a process.  I didn't have a

4    clue as to how long it would take.  I would

5    hope quicker.

6         Q    Who did you talk to on July 16th?

7         A    I don't recall the name, someone

8    from personnel.  It might have been the same

9    person who actually gave me the application.

10        Q    Did she call you or did you call

11   her?

12        A    She called me.

13        Q    And what did she say?

14        A    Mr. Jones, there seems to be a

15   problem concerning your background check.  And

16   I was surprised and I said excuse me.  She said

17   there seems to be some stuff on your background

18   check.  So I asked her what it was.  I don't

19   recall if she actually mentioned it, I want to

20   say she did not.  But she said, I have a number

21   if you want to call Sterling to verify this

22   information.  I was very -- I don't want to say

23   very upset, but I was very surprised.

24        Q    You said -- I think you said you

25   didn't think she mentioned it, is that what you

1                    KEVIN ALEXANDER JONES

2          Q     Did you explain to Sterling that

3    you had a similar problem with the Florida

4    records when you were trying to get your

5    license renewed?

6          A     Yes, I did.  But I'm not positive

7    if it was that call or a second call.

8          Q     Are you aware that the complaint

9    that was filed on your behalf describe the

10   calls you had on July 16th with Halstead and

11   Sterling?

12         A     No.

13         Q     What did -- what, if anything, did

14   Sterling suggest you do during this call on

15   July 16th?

16         A     From what I recall, they suggested

17   if I want to dispute the findings, they'll make

18   a note of that and they'll send me a copy of

19   the actual report.

20         Q     Did they -- did Sterling instruct

21   you on how to dispute the findings?

22         A     I was basically doing it over the

23   phone.  I don't recall a certain procedure per

24   se.

25         Q     So what did you do on the phone

1                  KEVIN ALEXANDER JONES

2    call to dispute the findings?

3         A    I kept denying that the person who

4    they did a background check was not the person

5    they were talking to.

6         Q    Did you do anything else to file a

7    dispute with Sterling regarding the report?

8         A    Well, eventually what I wound up

9    doing was sending them copies of the

10   information I sent to Florida just to try to

11   help my case.

12        Q    Why did you send that to Sterling?

13        A    Because the situation in Florida,

14   when I sent that information, it got resolved.

15   I was hoping to get the same result.

16        Q    Did you believe that the same

17   records that were a problem when you were

18   getting your license renewed were the same

19   records Sterling was reporting to Halstead?

20        A    I kind of felt that especially

21   since with the name similarity.

22        Q    Right.  Because it was a Kevin

23   Jones who committed the infractions in Florida,

24   right?

25        A    Correct.

1                    KEVIN ALEXANDER JONES

2          Q    And now you're being told that a

3    Kevin Jones was -- had committed similar crimes

4    and it was also being attributed to you, right?

5          A    Correct.

6          Q    So you thought it was the same

7    records, right?

8          A    Correct.

9          Q    Did you tell that to the person on

10   the phone at Sterling?

11         A    Did I tell them?

12         Q    I'm sorry.  When you were talking

13   to Sterling on July 16th, did you tell them I

14   had a similar problem a couple of years ago?

15         A    Yes.

16         Q    And that it was the Florida

17   records?

18         A    Yes.

19         Q    Did you explain to Sterling that

20   you had to fill out a not me affidavit back

21   then?

22         A    Correct.

23         Q    And did she say -- did the

24   Sterling employee say, well, then please send

25   that to us?

1                    KEVIN ALEXANDER JONES

2          Q    As of May of 2013, had you ever

3     told any friends or family about this incident

4     you had where you tried to apply for a job with

5     Halstead and didn't get it?

6          A    I'm sure I have.

7          Q    Do you recall who you spoke to

8     about that?

9          A    No.

10         Q    Is that because it was not a

11    significant event in your life?

12         A    No, that's not the reason.

13         Q    Was it a significant event in your

14    life?

15         A    Yes.

16         Q    And why is that, sir?

17         A    We're talking livelihood,

18    employment.  We're talking false information.

19    We're also talking embarrassment, that's what

20    makes it a significant event.

21         Q    You were embarrassed in front of

22    somebody?

23         A    I was embarrassed to have to

24    address certain issues that are on paper, that

25    are stopping me from going where I want to go,

KEVIN ALEXANDER JONES

1
2    whether it be another job or just moving on to
3    whatever I'm going to do in my life.  And then
4    to find out that it's not true, which is what
5    I've been saying all along.  Yes, that's
6    embarrassing.
7              Q    Was it similar to the
8    embarrassment you had in 2009 when the New York
9    State Department of Motor Vehicles thought that
10   you had committed some driving infractions in
11   Florida?
12             A    It was very similar.
13             Q    Miss Court Reporter, can you mark
14   this as the next exhibit?
15                  (Document, Bates stamped JONES
16                  00185 was marked as Plaintiff's
17                  Exhibit No. 11 for identification,
18                  as of this date.)
19             Q    Mr. Jones, you've been handed
20   what's been marked Exhibit No. 11 which are
21   some more pages that your lawyers provided to
22   us in connection with the lawsuit.  It should
23   be numbered Jones 185 through Jones 193.  Is
24   that what you have, sir?
25             A    Yes.

1                KEVIN ALEXANDER JONES

2         A    Correct.

3         Q    So is that the class you're trying

4    to represent, people who Sterling misreported

5    information on?

6         A    Absolutely.

7         Q    Is there anybody else that you

8    seek to represent in this class action?

9         A    Besides the class?

10        Q    Yes.

11        A    No.

12        Q    Do you understand that you have

13   certain obligations to the class if you are

14   appointed by the court as a class

15   representative?

16        A    Yes.

17        Q    What are those obligations, sir?

18        A    To the best of my ability, to get

19   the information and to represent the people

20   that are in the same situation, to the best of

21   my ability.  As far as my lawyers advise me to

22   do, that's what I'll do.

23        Q    So you'll do whatever your lawyers

24   advise you to do?

25        A    I'll do what's right.

1

2                    CERTIFICATE

3        STATE OF NEW YORK )

4                        )ss:

5        COUNTY OF RICHMOND)

6              I, DANIELLE GRANT, a Certified

7              Shorthand Reporter, and Notary

8              Public within and for the State of

9              New York, do hereby certify:

10             ThatKEVIN ALEXANDER JONES, the witness

11             whose deposition is hereinbefore

12             set forth, was duly sworn by me and

13             that such deposition is a true

14             record of the testimony given by

15             such witness.

16             I further certify that I am not

17             related to any of the parties to

18             this action by blood or marriage

19             and that I am in no way interested

20             in the outcome of this matter.

21             In witness whereof, I have hereunto

22             set my hand this 12TH day of

23             December, 2014.

24             _____

               DANIELLE GRANT
25